UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ANTHONY LAMARCA,

      Petitioner,

-vs-                                     Case No.  8:06-cv-1158-T-17MSS

SECRETARY, DEPARTMENT OF
CORRECTIONS,

      Respondent.

_____

O R D E R

      Petitioner Anthony Lamarca is a Florida prisoner under sentence of death.  Before

the Court is Lamarca's third amended 28 U.S.C. § 2254 petition for writ of habeas corpus

(Doc. No. 76)[1] and supporting memorandum (Doc. No. 77); Respondent's response to the

petition (Doc. No. 85); and Petitioner's reply to the response.  (Doc. No. 88).  The petition

was timely-filed and venue in this Court is proper because Lamarca was tried and

sentenced in Pinellas County, Florida, within this Division of the Middle District of Florida.

      The issues have been fully briefed and the case is ready for decision.  No evidentiary

hearing is necessary because the record is fully developed. All of the claims lack merit and

the petition will be denied.

STATEMENT OF FACTS AND PROCEDURAL HISTORY

_____

     [1] Local Rule 4.01(a) states: "Unless otherwise directed by the Court, any party permitted to amend a pleading shall file the amended pleading in its entirety with the amendments incorporated within." Pursuant to Rule 4.01(a), LaMarca's original petition and his first and second amended petitions are not before this Court for consideration, as the third amended petition incorporates any amendments made by appointed counsel.

The Pinellas County Grand Jury indicted Petitioner, Anthony Lamarca, on January 24, 1996, for the first-degree, premeditated murder of Kevin Flynn on December 2, 1995. (A1, 8). Lamarca was tried by jury on November 3-6, 1997. (A24, 1; A31, 1156). The jury found Lamarca guilty of first-degree murder as charged. (A15, 2876; A31, 1267). The court entered a judgment of guilt on November 6, 1997. The penalty phase of the trial was conducted before the jury on November 20, 1997. (A32, 1). The jury recommended death by a vote of 11 to 1. (A16, 2916; A32, 1430). The court held a sentencing hearing on December 19, 1997. (A33, 12-37). On February 20, 1998, the court sentenced Lamarca to death. (A16, 3024-32; A23, 3466-75).

The court appointed the public defender to represent Lamarca on appeal. (A16, 3034). Lamarca's notice of appeal was filed on March 17, 1998. (A16, 3054).On March 8, 2001, the Florida Supreme Court affirmed Lamarca's conviction and sentence.[2] *Lamarca*

---

[2] On direct appeal, Lamarca raised the following six issues:

ISSUE I--The admission of collateral crime evidence violated Appellant's right to a fair trial because the evidence was not relevant to any material issue and its probative value was outweighed by its prejudicial effects.

ISSUE II--The trial court violated Appellant's due process right to present his defense by excluding evidence which was relevant to show Tonya Flynn had a motive to kill her husband.

ISSUE III--Appellant's right to a fair trial was violated when the prosecutor asked a question implying that Appellant was in prison a few months before the homicide when he said he was going to kill his son-in-law.

ISSUE IV--The State's circumstantial evidence of how the killing occurred was not sufficient to establish Appellant's guilt of premeditated first-degree murder.

ISSUE V--The trial court failed to properly evaluate evidence of mitigating circumstances.

ISSUE VI--Under the circumstances of this case, the death sentence is not proportional, or proportionality cannot be reliably determined.

(A34, i, ii)

-2-

*v. State*, 785 So. 2d 1209 (Fla. 2001).  In upholding the conviction and death sentence, the

Florida Supreme Court set out the following factual summary:

> The State presented the following evidence. James Hughes testified that prior to the murder appellant told him he was going to kill the victim. Hughes asked why and appellant replied, "I'm gonna kill him."

> On December 2, 1995, at approximately 4:30 p.m., the victim and Tonya Flynn, his wife, went to a neighborhood bar. Appellant, Tonya's father, was also at the bar and asked Tonya if he could borrow her car. The victim offered to drive appellant home and they left at approximately 7:45 p.m.

> Appellant returned to the bar alone at approximately 8:30 and told Tonya that she had to drive to Hudson County to pick up the victim. After arriving at their destination, appellant raped Tonya in an otherwise unoccupied [trailer] house. Tonya subsequently called the police, who began to look for appellant. Deputy Sean Kennedy testified that he saw appellant walking along a road, appellant dropped objects he was carrying, and he ran away. Detective Jeffrey Good arrived at appellant's trailer at 2:15 a.m. on December 3. Good looked through the bedroom window and saw the victim's body. He entered and saw bullet casings on the floor, blood in the living room, kitchen, and hall, and the body in the bedroom.

> Stephanie Parker testified that on the night in question she heard a car drive up, she looked out her window, and she saw appellant and another man walking from the car to the front door of appellant's trailer. They appeared to be arguing because of their hand gestures. Parker stated that she then fell asleep and her father subsequently awakened her at the behest of the police.

> Later that morning, appellant arrived at the home of Jeremy Smith, who testified that appellant said: "I did it. I killed him." Smith asked who he killed and appellant said "Kevin." Appellant said that he killed Kevin in a trailer, that it really "sucked," but that he had to do it.

> Appellant testified in his defense and pursued the theory that Tonya killed her husband. He also denied making incriminating statements. During the penalty phase, appellant waived his right to counsel and elected to represent himself with the appointed public defender acting as standby counsel. Appellant rested his case without testifying or presenting any mitigating evidence, although standby counsel proffered mitigating evidence she could have presented.

> The trial court found one aggravating factor-prior convictions for violent felonies based on appellant's 1984 convictions for kidnaping and attempted sexual battery. The trial court found that appellant knowingly and voluntarily

waived his right to present mitigating evidence. The court recognized that it had to give good faith consideration to any mitigation in the record and specifically considered the following factors: (1) insufficient evidence that appellant was subject to extreme mental or emotional disturbances; (2) appellant's age-forty-was not mitigating; (3) appellant was drinking and angry at his daughter on the day of the offense, but the circumstance was unestablished; (4) insufficient evidence of appellant's work record; (5) appellant was generally well-behaved at trial--very little weight; and (6) appellant suffered from drug and alcohol abuse and psychological problems-very little weight. The court ruled that the proffered evidence could not be considered in mitigation.

*Lamarca v. State*, 785 So. 2d at  1211-1212.

Lamarca's Petition for Writ of Certiorari to the Supreme Court was denied on October 1, 2001. *Lamarca v. Florida*, 534 U. S. 925, 122 S.Ct. 281, 151 L.Ed.2d 206 (2001). Lamarca filed his Motion to Vacate Judgment and Sentence pursuant to Florida Rule of Criminal Procedure 3.851 on October 2, 2002, and raised twenty-three claims.

On February 28, 2003, the Honorable Brandt C. Downey, Jr. presided over a Huff hearing. *Huff v. State*, 622 So. 2d 982, 983 (Fla. 1993). Subsequently, the trial court held an evidentiary hearing on Lamarca's 3.851 amended Rule 3.851 motion filed May 1, 2003, and ultimately denied relief in its order dated September 11, 2003. The evidentiary hearing took place at two separate times. Beginning on May 29, 2003, the trial court conducted a four-day evidentiary hearing in which it heard most of the testimony regarding Lamarca's claims. On June 27, 2003, the court heard additional testimony. The state trial court's order denying Lamarca post-conviction relief was affirmed on appeal. *Lamarca v. State/McDonough*, 931 So. 2d 838 (Fla. 2006), *reh'g denied*, 2006 Fla. LEXIS 1257 (Fla. June 7, 2006). In his unsuccessful appeal, Mr. Lamarca raised the following claims:

Argument I--Mr. Lamarca was denied the effective assistance of counsel at the guilt and advisory phase of his trial, in violation of the Sixth, Eighth, and Fourteenth Amendments. Trial counsel failed to effectively represent their client, advocate for his position and protect his interests when it was apparent

that Mr. Lamarca was incompetent to proceed to trial. Counsel's ineffectiveness resulted in the failure of the State's case to be tested in an adversarial way which severely prejudiced Mr. Lamarca.

Argument II--Mr. Lamarca was denied the effective assistance of counsel at the guilt phase of his trial, in violation of the Fourth, Sixth, Eighth, and Fourteenth Amendments. Trial counsel failed to move to suppress certain evidence gathered by law enforcement in violation of the Fourth Amendment of the United States Constitution and the corresponding provision of the Florida Constitution. Counsel's failure severely prejudiced Mr. Lamarca.

Argument III--Mr. Lamarca was denied the effective assistance of counsel at the guilt and advisory phase of his trial, in violation of the Sixth, Eighth, and Fourteenth Amendments. Trial counsel failed to effectively cross examine Tonya Lamarca Flynn. Counsel's failure severely prejudiced Mr. Lamarca.

Argument IV--Mr. Lamarca was denied the effective assistance of counsel at the guilt phase of his trial, in violation of the Sixth, Eighth, and Fourteenth Amendments. Trial counsel failed to move for a motion to continue the trial when they knew they were unprepared to proceed to trial. Counsel's failure to move for a motion to continue severely prejudiced Mr. Lamarca.

Argument V--Mr. Lamarca was denied the effective assistance of counsel at the guilt phase of his trial, in violation of the Sixth, Eighth, and Fourteenth Amendments. Trial counsel failed to effectively cross Darrin Brown. Counsel's failure severely prejudiced Mr. Lamarca.

Argument VI--Mr. Lamarca was denied the effective assistance of counsel at the guilt phase of his trial, in violation of the Sixth, Eighth, and Fourteenth Amendments. Trial counsel failed to offer the testimony of Lori Lamarca Galloway to rebut the evidence of guilt offered by the State in the form of his fleeing the state of Florida. Counsel's failure to offer this evidence severely prejudiced Mr. Lamarca. Further the State offered testimony in violation of *Brady, Kyles and Giglio* at the guilt phase of his trial, in violation of the Sixth, Eighth, and Fourteenth Amendments concerning Mr. Lamarca's travel plans.

Argument VII--Mr. Lamarca was denied the effective assistance of counsel at the guilt phase of his trial, in violation of the Sixth, Eighth, and Fourteenth Amendments. Trial counsel failed to offer the testimony of James Zaccanino [sic] to rebut the testimony of Michael Hughes. Counsel's failure severely prejudiced Mr. Lamarca. Further the State offered testimony in violation of *Brady and Giglio* at the guilt phase of his trial, in violation of the Sixth, Eighth, and Fourteenth Amendments concerning Mr. Lamarca's statements.

Argument VIII--Mr. Lamarca was denied the effective assistance of counsel at the guilt phase of his trial, in violation of the Sixth, Eighth, and Fourteenth

Amendments. Trial counsel failed to offer the evidence of Steve Slack to rebut the testimony of Tonya Lamarca Flynn. Counsel's failure severely prejudiced Mr. Lamarca.

Argument IX--The State offered testimony in violation of *Brady and Giglio* at the guilt phase of his trial, in violation of the Sixth, Eighth, and Fourteenth Amendments when Jeremy Smith testified about receiving consideration from the State concerning pending criminal charges. The evidence was material and would have affected the outcome of the trial.

Argument X--Mr. Lamarca was denied the effective assistance of counsel at the guilt and adversary phase of his trial, in violation of the Sixth, Eighth, and Fourteenth Amendments. Trial counsel failed to offer expert testimony regarding the complete absence of any DNA material from the scene of the alleged sexual battery of Tonya Lamarca Flynn.

Argument XI--Mr. Lamarca was denied the effective assistance of counsel at the adversary phase of his trial, in violation of the Sixth, Eighth, and Fourteenth Amendments. Trial counsel failed to adequately investigate mitigation evidence and present such evidence to the court.

Argument XII--Mr. Lamarca's sentence of death is unconstitutional in violation of the Eighth and Fourteenth Amendments to the United States Constitution and the corresponding provisions of the Florida Constitution because his sentence rests upon the proof of only one aggravator which has been repeatedly found to be inadequate under Florida law.

Argument XIII--Mr. Lamarca's sentence of death is unconstitutional in violation of the Eighth and Fourteenth Amendments to the United States Constitution and the corresponding provisions of the Florida Constitution because his sentence rests upon an improper aggravator when the State introduced evidence that Mr. Lamarca committed a prior violent felony using a knife.

Argument XIV--Mr. Lamarca's sentence of death is unconstitutional in violation of the Eighth and Fourteenth Amendments to the United States Constitution and the corresponding provisions of the Florida Constitution because the State committed prosecutorial misconduct in the presentation of Mr. Lamarca's prior felony.

Argument XVI--Mr. Lamarca was denied the effective assistance of counsel at the guilt phase of his trial, in violation of the Sixth, Eighth, and Fourteenth Amendments. Trial counsel failed to effectively impeach the testimony of Jeremy Smith with his prior convictions involving crimes of dishonesty. Counsel's failure severely prejudiced Mr. Lamarca.

> Argument XVII--Mr. Lamarca was denied the effective assistance of counsel at the guilt phase of his trial, in violation of the Sixth, Eighth, and Fourteenth Amendments. Trial counsel failed to effectively investigate and then cross examine the testimony of the State's ballistic expert.

(C32, ii-v)

Lamarca filed a state petition for writ of habeas corpus on July 21, 2004.  The state petition presented the following grounds for relief:

> Argument I--Lamarca's death sentence is unconstitutional in light of *Ring v. Arizona and Apprendi v. New Jersey*.

> Argument II--The trial court conducted an invalid inquiry under *Faretta v. California*.

> Argument III--Lamarca was denied the right to participate in jury selection.

> Argument IV--The trial court improperly dismissed certain jurors for cause.

The Florida Supreme Court rejected all of his claims in an opinion issued on April 20, 2006. *Lamarca v. State*, 931 So. 2d 838 (Fla. 2006), *reh'g denied*, 2006 Fla. LEXIS 1257 (Fla. June 7, 2006).

Through retained counsel, Lamarca timely filed a 28 U.S.C. § 2254 petition in this Court.  He is proceeding on his third amended petition, and is represented by appointed counsel.

## STANDARDS OF REVIEW

Because Lamarca filed his petition after April 24, 1996, this case is governed by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). *Penry v. Johnson*, 532 U.S. 782, 792 (2001); *Henderson v. Campbell*, 353 F.3d 880, 889-90 (11th Cir. 2003); *Maharaj v. Sec'y of Dept. of Corrections*, 304 F.3d 1345, 1346 (11th Cir. 2002). The ultimate issue with respect to each claim is whether the Florida Supreme Court's resolution of the claim was "contrary to, or involved an unreasonable

application of, clearly established Federal law as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d).  *Williams v. Taylor*, 529 U.S. 362 (2000); *Robinson v. Moore*, 300 F.3d 1320 (11th Cir. 2002); *Van Poyck v. Florida Department of Corrections,* 290 F.3d 1318 (11th Cir. 2002).  The standard Lamarca must meet could not be higher; it is not enough that the state court "got it wrong."  Lamarca must show that the result of the state court's decision was objectively unreasonable. *Bell v. Cone*, 535 U.S. 685, 694 (2002) (citing *Williams v. Taylor*, *supra*).

In the event constitutional error is found in a habeas proceeding, the relevant harmless error standard is set forth in *Brecht v. Abrahamson*, 507 U.S. 619 (1993). The test is "less onerous" then the harmless error standard enunciated in *Chapman v. California*, 386 U.S. 18 (1967). "The test is whether the error had substantial and injurious effect or influence in determining the jury's verdict. Under this standard, habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" *Brecht,* 507 U.S. at 637. Although no constitutional error has occurred in Lamarca's case, any possible error would be harmless beyond any reasonable doubt based on the facts and the record herein.

No evidentiary hearing is required because none of Lamarca's claims turn on any unresolved issue of fact;  all involve issues of law argued on the basis of the existing record.[2]

Ineffective Assistance of Counsel Standard

---

[2] The state trial court conducted an evidentiary hearing.  Its findings are "presumed to be correct" (28 U.S.C. § 2254(e)(1)) and there is no showing that its decision "was based on an unreasonable determination of the facts. . ." (28 U.S.C. § 2254(d)(2)).

To prevail on a claim of ineffective assistance of trial or appellate counsel, a Petitioner must meet the two-part test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland*'s two-part test requires a Petitioner to demonstrate that counsel's performance was deficient and "there was a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* However, if a claim fails to satisfy the prejudice component, the court need not make a ruling on the performance component.

## DISCUSSION

### GROUND ONE

### A. MR. LAMARCA RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL AT THE GUILT PHASE OF HIS CAPITAL TRIAL IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

Lamarca asserts that his representation was "tainted" because the elected Public Defender initially objected to appointment on the basis that Lamarca was not indigent. (Third Amended Petition at 11). However, this specific claim was not raised in state court Consequently, the claim has not been exhausted and is procedurally barred in this Court. In any case, the office appointed two of its most experienced attorneys to represent Lamarca and Lamarca did not show his defense was in any way hampered or interfered with by the elected Public Defender.

Lamarca's Defense Attorneys

In the order denying the Rule 3.851 motion, after the evidentiary hearing, the state trial court described the defense attorneys:

Ron Eide, who was primarily responsible for the guilt phase, testified that he has been a criminal defense attorney for over 26 years, that he has tried hundreds of murder cases to date, that he is now the Chief Assistant in the

-9-

Public Defender's Office, and that he is the head of the Capital Defense Team (CAP) within that office. Nora McClure, who was primarily responsible for the penalty phase, is currently a Sr. Assistant Public Defender who has been a practicing criminal defense attorney for over 22 years. She testified that she is board certified in criminal trial work, that she has been a member of the CAP team for approximately 20 years, that she is currently in charge of 3 felony divisions, and that she has presented mitigating evidence on at least 8 or 9 occasions to date.

(C3, 352)

In addressing all of Lamarca's ineffective assistance of counsel claims, the Florida Supreme Court utilized the test set forth by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), requiring that a defendant establish two elements in order to support a claim on ineffective assistance of counsel: (1) that counsel"s performance was deficient, and (2) that the deficient performance prejudiced the defense. Lamarca fails to demonstrate that the state court's disposition of his claims were "contrary to" or constituted an "unreasonable application of" governing Supreme Court precedent.

An allegation of ineffective assistance requires a specific fact-based assertion upon which a court may evaluate whether or not counsel functioned at the minimal level required by the Constitution. A petitioner "must do more than satisfy the *Strickland v. Washington*, 466 U.S. 668 (1984) standard. He must also show that in rejecting his ineffective assistance of counsel claim the state court applied *Strickland* to the facts of his case in an objectively unreasonable manner." *Rutherford v. Crosby*, 385 F.3d 1300, 1309 (11th Cir. 2004) (quoting *Bell v. Cone*, 535 U.S. 685, 699 (2002)). Within the wide range of reasonable professional assistance, there is room for different strategies, no one of which is "correct" to the exclusion of all others. *Felker v. Thomas*, 52 F.3d 907 (11th Cir. 1995). Lamarca has failed to show that his trial representation was "tainted."

-10-

**B. TRIAL COUNSEL FAILED TO EFFECTIVELY REPRESENT MR. LAMARCA AT THE GUILT PHASE OF HIS CRIMINAL TRIAL.**

**1. Trial Counsel Was Ineffective In Failing To Impeach Witnesses and Present Evidence**

**a. Jeremy Smith**

Lamarca maintains that his defense attorneys were ineffective for failing to impeach witness Jeremy Smith with a misdemeanor retail theft conviction. The state trial court denied this claim, stating, in part:

> ...Although CCRC failed to address this claim at the evidentiary hearing, Defense Exhibit #10 is a copy of the Criminal Justice Information System Docket Screen, which does reflect an adjudication of guilt for a misdemeanor retail theft conviction in CTC95-O7971MMANO. Nevertheless, the defendant has failed to show how he was prejudiced by Eide's failure to elicit testimony concerning the misdemeanor theft conviction, as required under *Strickland*. The fact of the matter is that Smith was already impeached on the basis of his prior criminal history. The additional mention of a misdemeanor conviction would have had little to no effect in further undermining Smith's credibility.

(C3, 372)

On appeal from the denial of post-conviction relief, the Florida Supreme Court affirmed the state trial court stating:

> Lamarca fails to satisfy the prejudice prong of *Strickland* in his claim that defense counsel was ineffective for not impeaching Smith with evidence of Smith's prior conviction for a misdemeanor. The trial court found that Smith "was already impeached on the basis of his prior criminal history" because on direct, he testified to one felony conviction involving dishonesty. The fact that defense counsel failed to elicit an additional, lesser prior conviction does not require a finding of ineffective assistance. *See Mansfield v. State*, 911 So. 2d 1160, 1174 (Fla. 2005) (rejecting ineffectiveness claim based on failure to elicit federal charges pending against State's witness because the appellant failed to show how the outcome would have been different if the witness's full record had been known). Therefore, we affirm the trial court's denial of this claim.

*Lamarca v. State*, 931 So. 2d 838, 851 (Fla. 2006). (C-40).

The state courts cited the prevailing law [*Strickland*] and applied it to the facts of this case. Lamarca fails to carry his burden under the AEDPA as to this claim. Lamarca has not attempted to show that the state courts' resolution of this claim was contrary to controlling Supreme Court precedent or an unreasonable application of established constitutional law. The record reflects that Smith's credibility was impeached with his prior felony conviction and his extensive drug use. Counsel cannot be considered ineffective for failing to uncover and use a prior misdemeanor conviction. The prior conviction does not represent significant impeachment evidence. As found by the state courts, Lamarca failed to establish either deficient performance or prejudice under *Strickland*.

Lamarca improperly attempts to impeach Smith with deposition testimony of John Ehrke. (Third Amended Petition at 16). However, Smith was not called to testify during the evidentiary hearing. Nor was John Ehrke. Thus, the state courts were not presented with any evidence to support Lamarca's assertion that counsel should have impeached  Smith with a statement from Ehrke that "Smith was a known liar" (Third Amended Petition at 16). Nor did Lamarca present any evidence to support his characterization of Smith's testimony, i.e, his assertion of Smith's untruthfulness of his responses and motives for testifying. The only untruthfulness, if any, in Smith's testimony was the fact that he failed to disclose a single misdemeanor retail theft conviction when he was asked about his criminal history during trial.

Lamarca also suggests Smith was given undisclosed consideration which counsel, allegedly, should have uncovered and presented. However, this claim was not presented in state court and litigated as an ineffective assistance of counsel claim. This claim was presented and litigated as a *Brady/Giglio* violation. Therefore, this specific portion of

Lamarca's argument is not properly raised in this Court as an ineffective assistance of counsel claim. Exhaustion is not satisfied "merely" if the petitioner presents the state court with "all the facts necessary to support the claim" or even if a "somewhat similar state-law claim was made." *Kelley v. Sec'y for Dept. of Corr.*, 377 F.3d 1317, 1343-44 (11th Cir. 2004). Thus, the ineffectiveness portion of his claim regarding a deal with witness Smith has not been exhausted and is procedurally barred. Lamarca fails to acknowledge the adverse legal and factual rulings on his related *Brady/Giglio* claim.

The Florida Supreme Court affirmed the state trial court, providing the following analysis:

> In regard to Smith's trial, the record fails to establish that any benefit he received from testifying at Lamarca's trial came as the result of a deal. While the trial judge delayed Smith's sentencing hearing in order to allow Smith's defense counsel to put forth evidence that Smith was participating in Lamarca's trial, Lamarca failed to put forth any evidence establishing that this benefit was promised in advance or was part of a deal. At the evidentiary hearing, Smith's defense counsel at this sentencing hearing testified that the trial judge did not agree to lessen Smith's sentence based on evidence that Smith participated in Lamarca's trial. Moreover, the transcript from the sentencing hearing confirms this. While both an assistant state attorney and a state investigator assigned to Lamarca's case testified at Smith's sentencing hearing that Smith had cooperated in Lamarca's case, both also made it clear that their testimony at this hearing was not part of any deal. The assistant state attorney assigned to Lamarca's case specifically stated on the record at Smith's sentencing hearing, "There's no deal. No wink of the eye or anything with regard to Mr. Smith. He's here before Your Honor as a straight-up plea as far as we're concerned." Lamarca has not established that either Hughes' or Smith's testimony came as a result of a deal; therefore, we affirm the trial court's denial of this claim.

*Lamarca v. State*, 931 So. 2d at 853.

As the state courts held, there was no undisclosed "deal" or agreement with Jeremy Smith. Lamarca fails to acknowledge the State court rulings, much less provide evidence to show the factual findings are clearly erroneous.

This claim does not warrant relief.

**b. Tonya Flynn**

Lamarca asserts that the defense attorneys were ineffective for failing to effectively cross-examine Tonya Flynn, Lamarca's biological daughter, as to the sexual battery. Lamarca initially asserts that investigation by law enforcement revealed no evidence of sexual battery. (Third Amended Petition at 18). However, he provides no support for this assertion. In fact, support for the sexual assault allegation was found in the rape exam and DNA testing. As noted by trial counsel Eide, the SAVE exam and potential testimony of the State's forensic expert, would have been damaging to the defendant. While the State did not have evidence of Lamarca's semen on the bed sheets, they did have as evidence saliva on Tonya's breast which was consistent with Lamarca's DNA[3] and "evidence of marks on her neck." (C4, 513). Eide was also aware that the SAVE exam revealed fresh injuries to Tonya, including redness around the vagina and anal area. (C5, 594-95). The evidence of strangulation around Tonya's throat was consistent with Tonya's testimony that Lamarca grabbed her around the neck, kicked in the door, and dragged her inside the trailer where he lived. (C5, 595).

The majority of Lamarca's claims of ineffectiveness for failing to impeach Tonya generally reference depositions and, by inference, an allegedly inconsistent statement from Tonya. However, Tonya was not called to testify by the defense during the evidentiary

---

[3] Sue Livingston testified that a swab taken from Tonya's face revealed genetic markers consistent with Tonya. (C3, 432). A second swab from Tonya's breast revealed a mixture consistent with Tonya and Lamarca's DNA, but excluded Kevin Flynn. (C3, 433-34). Assuming one donor of saliva on the breast was Tonya, the possibility of finding another contributor in the general population with the genetic markers consistent with Lamarca's were "approximately one in 390." (C3, 435).

hearing, and Lamarca has, therefore, failed to establish the effectiveness, or weight, of the majority of the proposed impeachment testimony. Trial counsel cannot be considered ineffective for failing to effectively cross-examine a witness, where collateral counsel fails during an evidentiary hearing, to cross-examine the witness in question. Although discovery depositions were admitted into evidence at the trial, they were not admitted pursuant to a stipulation of the truthfulness of their assertions. They were admitted as part of the trial attorneys' file. If collateral counsel desired to establish relevant, admissible impeachment testimony, he had an obligation to call Tonya, or, at the very least, the witness who would provide the allegedly impeaching testimony. This was the argument made by the State on appeal to the Florida Supreme Court. (Appellee's Brief at 61-62 (C-33)). Lamarca failed to develop the factual basis for this claim in the state court. *See Arthur v. Allen*, 452 F.3d 1234 (11th Cir. 2006)(affirming denial of an evidentiary hearing in federal court where petitioner knew of the factual basis of the claim in state court but failed to pursue it)(citing 28 USC § 2254 (e)(2)); *McNair v. Campbell*, 416 F.3d 1291, 1300-1301 (11th Cir. 2005)(finding the district court erred in granting an evidentiary hearing where petitioner was not diligent in developing the factual basis for his ineffective assistance of counsel claim in state court).

Lamarca has not alleged that the exceptions for failing to develop his claim under Section 2254(e)(2) apply, i.e, the factual predicate could not have been discovered and that the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable fact finder would have found the applicant guilty of the underlying offense.

The only portions of this claim that were developed by collateral counsel in state court were those involving Steve Slack and Sue Livingston (DNA results). However, no

other witnesses were called to testify at the evidentiary hearing concerning an allegedly inconsistent comment or statement from Tonya.[4]  As noted above, the defense did not call Tonya in an attempt to establish the existence of, or, the force and effect of the allegedly impeaching information. Since Lamarca's ineffective assistance of counsel claim was that counsel failed to effectively cross-examine Tonya Flynn, it was incumbent upon collateral counsel to call her during the evidentiary hearing. *See Spencer v. State*, 842 So. 2d 52 (Fla. 2003)(rejecting ineffectiveness claim where collateral counsel failed to call the allegedly impeaching witness during the evidentiary hearing and noting that reversible error cannot be predicated on "conjecture.")(citing *Sullivan v. State*, 303 So. 2d 632, 635 (Fla. 1974)). Since he was provided an evidentiary hearing but did not call Tonya to testify, Lamarca has failed to prove this claim in state court.[5]

As noted above, Lamarca did call Steve Slack and FDLE expert Sue Livingston to testify at the evidentiary hearing in an attempt to establish impeachment evidence. However, it was improper for Lamarca  simply to point to material such as a deposition or police report and suggest that Tonya's trial testimony would somehow be impeached by that material. *See generally Rodriguez v. State*, 609 So. 2d 493, 498-99 (Fla. 1992)(discovery depositions generally constitute hearsay and are not admissible as substantive evidence).

---

[4] Lamarca failed to even assert in state court Tonya's allegedly impeachable statement to Detective Morrison that she attempted to leave the residence through the front door. Consequently, this claim was not exhausted in state court and is procedurally barred. (C1, 13-16). Similarly, the allegedly impeachable statement about the barricade was not a claim made in state court and has not been properly raised or exhausted in state court . (Amended Habeas Petition at 20; C1, 14-16).

[5] The trial court found that Lamarca failed to establish either deficient performance or prejudice, noting that many of the alleged inconsistencies were either a) not inconsistent, b) would have required calling Tonya as a witness, or c) not even proper cross-examination.

In any case, the allegedly impeaching information cited in the third amended petition falls far short of casting any doubt upon the truth or veracity of Tonya's testimony. For example, Lamarca cites a police report which suggests that the front door was intact, not kicked in as Tonya testified. However, Lamarca did not call any witnesses to dispute Tonya's testimony on this matter. Moreover, the prosecutor testified , and, the photographs clearly showed that the front door was broken. Prosecutor Martin testified that two doors were broken in the house. (C7, 906). While he acknowledged that a report from Detective Ferguson stated that the front door was not broken, Martin testified: "I'm aware of that and I'm also aware of the photographs and the video that showed that it was, which was also turned over to the defense." (C7, 908). He had no information to suggest the doors were broken by the police and testified: "They [the photographs] were consistent with the doors that Tonya described as being broken at the time that Mr. Lamarca assaulted her, took her into the house at knife point, drug her through the house and went into the bedroom." (C7, 908).  Lamarca raises unsupported allegations such as Tonya "made a false statement to law enforcement" when she claimed that she did not know Kevin's condition or whereabouts (Third Amended Petition at 20). Lamarca presented no evidence in the state trial court to suggest, much less establish, that Tonya made such a false statement.

The thrust of Lamarca's argument is that the defense failed effectively to impeach Tonya on her testimony regarding the sexual battery. In rejecting this claim, the state trial court stated:

> The sum and substance of Eide's [defense attorney] testimony on this point was that he deliberately limited his cross-examination of Tonya regarding the sexual battery to avoid opening a door that would permit the State to introduce additional evidence concerning the sexual battery, evidence that had not been introduced, such as the S.A.V.E. exam, the DNA evidence, which reflected that the defendant was a possible donor of the saliva found

on Tonya's breast, and the evidence of strangulation, which was consistent with Tonya's version of the sexual battery. . . .

Finally, although Tonya was not cross-examined on the alleged inconsistent statements concerning the sexual battery, a review of the trial transcript reflects that Eide extensively argued the lack of DNA evidence surrounding the sexual battery during closing arguments. During his first argument, he argued that Tonya's testimony was unworthy of belief. Tonya testified that the defendant ejaculated on the sheet. However, no ejaculate or semen was ever found on the bed sheets. Eide argued this in full to the jury. He concluded his first argument by surmising that the sexual battery, as recounted by Tonya, was  simply "implausible." During his final argument, Eide argued: "And it's interesting that in his hour of discussion with you he [the prosecutor] never discussed the absence of any corroborative scientific testimony for Tonya's accusation of rape." Subsequently, he argued: "We talked about the fact that there's no semen on the sheets. There's no scientific evidence, there's no DNA, there's--there's no microscopic analysis of these sheets. There's been nothing presented. If they'd had it, you'd have heard it."

(C3, 360-361).

The Florida Supreme Court affirmed the denial of Rule 3.851 relief, stating in part:

Lamarca claims his counsel was ineffective in failing to effectively cross-examine Tonya Flynn and Darren Brown. [n7] As the trial court recognized, defense counsel's decision to limit the cross-examination of each of these witnesses was reasonable trial strategy.

Defense counsel testified that he strategically limited his cross-examination of Tonya and Darren in order to avoid opening the door to potentially incriminating information that would not otherwise have been admissible. As explained above, the admissibility of Tonya's testimony was limited to placing the murder weapon in Lamarca's possession. Strategically, defense counsel did not want to free the State from this limitation by impeaching Tonya's credibility and, thereby, allowing the State to introduce evidence to rehabilitate it. Instead, in his closing argument, defense counsel challenged the credibility of Tonya's testimony. As to Darren Brown, defense counsel limited his cross-examination because he feared an aggressive cross-examination would bring out Brown's earlier statement that Lamarca had confessed to killing Kevin.

We have long recognized that strategic decisions by trial counsel are "virtually unchallengeable." *Downs v. State*, 453 So. 2d 1102, 1108 (Fla. 1984); *see also Davis v. State*, 915 So. 2d 95, 115 (Fla. 2005) (recognizing that "counsel is not ineffective in exercising his decision to discontinue further investigation into matters that were already known to him and that he had

strategically determined should not be presented to the jury"), *cert. dismissed*, 126 S. Ct. 1649, 164 L. Ed. 2d 357, 2006 U.S. LEXIS 2841, No. 05-8805 (U.S. Mar. 30, 2006). The trial court's denial of this claim is affirmed.

*Lamarca v. State*, 931 So. 2d at 849-850 (footnote omitted).

Lamarca has not met the AEDPA's stringent requirements. The Florida Supreme Court's opinion was consistent with the facts and with Supreme Court precedent. Consequently, Lamarca is not entitled to relief on this claim.

Lamarca next asserts, as he did in state court, that his trial defense attorneys were ineffective for failing to call Steve Slack to impeach Tonya. Lamarca's claim lacks merit. The state trial court denied relief on this claim after hearing testimony from Lamarca's defense attorneys and from Steve Slack during the evidentiary hearing. In denying this claim, the trial court stated in part:

> Eide was questioned at length as to why he failed to call Slack as a witness. Eide explained that another witness, Detective Stacy Morrison, testified in her deposition that Tonya did tell Slack that she was raped by the defendant. Further, Eide explained that Slack admitted to Detective Michael Madden, on December 5, 1995, that Tonya told him that the defendant raped her. State's Exhibit #12, which is Detective Madden's supplementary report, confirms Eide's testimony.

> As such, Eide explained that he engaged in a balancing act with regard to "outcry witnesses," such as Slack, and that he was forced to weigh their credibility against the value of their testimony. Eide explained that Slack had been drinking alcoholic beverages that night--in fact, Slack indicated that he had 8 beers that night in his deposition. He further indicated that Slack had always maintained that Tonya was "very upset" that night, which only helped to confirm Tonya's testimony that she was raped.

> In the end, Eide made a tactical decision not to call Slack based on credibility, based on the fact that he was drinking heavily that night, and based on the fact that he could have been impeached by Detective Madden and/or Detective Morrison. [Transcript from June 27, 2003: Pages 74-75]. The court finds that Eide's explanation was well within the range of prevailing professional standards. Moreover, CCRC has failed to show, as required by *Strickland*, that Eide's tactical decision not to call Slack was deficient. *Spencer v. State*, 842 So. 2d 52, 62 (Fla. 2003) ("This court has held that

defense counsel's strategic choices do not constitute deficient conduct if alternative courses of action have been considered and rejected.").

(C3, 370-72)

The Florida Supreme Court affirmed the trial court on appeal, stating:

> The decision not to call James Zaccagnino and Steven Slack to testify was likewise a reasonable strategy. At the evidentiary hearing, defense counsel testified that he chose not to call these witnesses because he did not believe either of them was credible. He believed Zaccagnino's hearing difficulties and significant prison record made him a poor witness. Furthermore, counsel thought the uncontroverted fact that Slack had been drinking when he spoke with Tonya and that Slack contradicted himself in statements made to law enforcement officers rendered him not credible. These facts were substantiated at the evidentiary hearing. This claim was properly denied. *See Marquard*, 850 So. 2d at 428-29 (denying ineffective assistance claim for failing to call a witness when defense counsel did not find the witness credible).

*Lamarca v. State*, 931 So. 2d at 849.

The state trial court analyzed the testimony provided during the evidentiary hearing and concluded that defense counsel made a reasonable tactical decision not to call Steve Slack. Since trial defense counsel investigated the witness, decided not to call him, and provided a rationale for his decision, his decision is almost immune from post-conviction challenge. *Strickland,* 466 U.S. at 690-91 ("Strategic choices made after thorough investigation of the law and facts relevant to plausible options are virtually unchallengeable.").

Eide recognized that Slack could offer potentially damaging testimony. Slack had been drinking, testified that Lamarca was mad or upset when he left the bar prior to the murder, and that Tonya was upset when she returned to the bar. (C11, 1528). In addition to noting that Tonya was upset, Tonya said that Lamarca had raped Tina, his other

daughter.[6] (C5, 659). Moreover, Slack apparently told Detective Madden that Tonya did tell him she had been raped, and Eide was aware the State might call him in rebuttal. (C5, 649-50; C11, 1529). Eide had ample reason not to call Steve Slack. *See Conklin v. Schofield*, 366 F.3d 1191, 1204 (11th Cir. 2004)("which witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and it is one that we will seldom, if ever, second guess.").

Lamarca has failed to cite any clearly established federal law which establishes that the state courts' resolution of this claim was improper or incorrect. Consequently, this claim must be denied.

### c. James Zaccagnino

Lamarca contends that his defense attorneys were ineffective for failing to call James Zaccagnino as a witness to counter the testimony of James Hughes. Hughes testified about Lamarca's statement that Lamarca was going to kill Lamarca's son-in-law when he got out of prison because he raped his daughter.

Hughes apparently asserted that Zaccagnino was present when Lamarca made this statement. The state trial court rejected the assertion that the defense attorneys were ineffective in failing to call Zaccagnino, stating, in part: At the [evidentiary] hearing on June 27, 2003, Eide clarified that he chose not to call Zaccagnino as a witness for two reasons: 1) Zaccagnino had hearing difficulties; and 2) during his interview with Eide in the county jail prior to trial, Zaccagnino could not unequivocally testify that he was in the "yard" within hearing distance when Lamarca made the statements--in other words, Lamarca may have

---

[6] The defense would certainly want to prevent the jury from learning that Lamarca also raped his other daughter, Tina; information which defense counsel successfully kept from the jury by filing a motion in limine.

made the statement; Zaccagnino was just not there to hear it. [Pages 66-67]. Eide also

indicated that he was concerned with any mention, at trial, of "prison yard." Moreover, he

was concerned that Zaccagnino's prior criminal history would render him unreliable as a

witness.

> At the evidentiary hearing, Zaccagnino had difficulty hearing the first
> question that was asked of him. In fact, he answered it incorrectly. [Transcript
> from May 30, 2003: Pages 23-34]. Moreover, Zaccagnino is a long-time friend
> to the defendant, and is a convicted felon serving a life sentence. Because
> Eide's tactical decision not to call Zaccagnino as a witness was well within the
> range of prevailing professional standards, and because CCRC has failed to
> show that the outcome would have been different had Zaccagnino testified,
> this claim must fail under *Strickland* and its progeny. *Remeta v. Dugger*, 622
> So. 2d 452, 455 (Fla. 1993)(counsel's strategic decisions will not be second
> guessed on collateral attack).

(C3, 368).

The Florida Supreme Court affirmed on appeal, stating:

> The decision not to call James Zaccagnino and Steven Slack to testify was
> likewise a reasonable strategy. At the evidentiary hearing, defense counsel
> testified that he chose not to call these witnesses because he did not believe
> either of them was credible. He believed Zaccagnino's hearing difficulties and
> significant prison record made him a poor witness.

*Lamarca v. State*, 931 So. 2d 838, 849 (Fla. 2006).

Zaccagnino never told Eide "that Hughes told him he was making that [the threat to

kill Kevin] up." (C4, 541). Thus, Zaccagnino's more recent evidentiary hearing statement

to that effect is suspect. Although Lamarca thought Zaccagnino would be a good trial

witness, Eide disagreed: He [Zaccagnino] was a "convicted felon," "hard of hearing," and

indicated that "he may not have heard what was said at the time" and "wasn't worth losing

my closing argument." (C5, 648). Lamarca does not provide any record support for his

contention that Zaccagnino's hearing problems did not exist in 1995. (Third Amended

Petition at 22-23). At the evidentiary hearing, Defense Attorney McClure testified that she

was not sure Zaccagnino had any admissible trial evidence on Lamarca's reputation. (C9, 1346).

As the Florida courts noted, Eide's decision not to call Zaccagnino was a tactical one. It was not a decision based on ignorance or a failure to investigate, and is almost immune from post-conviction attack. Lamarca has once again failed to cite any factual errors in the state courts' resolution of this claim. The Florida courts correctly applied applicable Supreme Court precedent. Consequently, Lamarca is not entitled to relief on this claim.

### d. Lori Galloway Lamarca

Lamarca asserts here, as he did in state court, that his defense counsel rendered ineffective assistance by failing to call Lori Galloway/Lamarca to rebut the assertion that Lamarca fled the state after Kevin was killed. This Court disagrees. The state trial court provided a thorough analysis of this claim :

> ...At the hearing on May 29, 2003, Eide testified that he was aware that the defendant made plans with Lori to visit her upon his release from prison. [transcript from May 29, 2003: Pages 94-95]. He explained, however, that Lori made inconsistent statements about the reasons for the defendant's visit. At first, she told Bill Braun one story. According to his report, Lori told her son, Darren, that the defendant was coming to the state of Washington because he was wanted for the murder of Kevin Flynn, his son-in-law. The report also indicates that the defendant, after he arrived in Washington, bragged about killing his son-in-law to Darren and another individual named Clinton King. On the other hand, Lori told Mrs. McClure that the defendant made plans shortly after Thanksgiving to come visit and spend time with her, and that she knew of his visit four to five days in advance (see State's Exhibit #25).

> Mr. Eide explained that if he called Lori [Galloway] as a witness: 1) she likely would have been impeached with her inconsistent statements; 2) he and Mrs. McClure would have been suborning perjury; and 3) it would have undermined the defendant's explanation for his visit to the state of Washington, and again, Mr. Eide wanted to limit the testimony so that the

defendant's story appeared credible. [Transcript from May 29, Pages 178-184).

Based upon the testimony of Mr. Eide, and based upon the documentary evidence, the court is unable to conclude that Mr. Eide was deficient in failing to call Lori Galloway-Lamarca as a witness, as required under *Strickland*. The defendant conceded at trial that his arrival in the state of Washington was "unannounced." In addition, the State adduced evidence that the defendant ran from Deputy Sean Kennedy after being seen several hours after the murder (see below) --as the State notes in its response, Lori could not have rebutted this testimony. Mr. Eide considered calling Lori as a witness but rejected the idea based upon the factors outlined above. *Spencer v. State*, 842 So. 2d 52, 62 (Fla. 2003)("This court has held that defense counsel's strategic choices do not constitute deficient conduct if alternative courses of action have been considered and rejected."). Accordingly, the ineffectiveness claim is hereby denied under *Strickland.*

(C3, 365)

The Florida Supreme Court affirmed on appeal, stating:

Defense counsel testified that he did not call Lori Galloway to testify because she had made inconsistent and highly incriminating statements to an investigator hired by the public defender's office, and these statements were substantiated by the investigator's report. We affirm the trial court's decision. *See Marquard v. State*, 850 So. 2d 417, 427-29 (Fla. 2002) (denying ineffective assistance claim for failing to call a witness when defense counsel reasonably feared the witness would implicate the defendant in the crime).

*Lamarca v. State*, 931 So. 2d at 849.

Lamarca fails to point to any factual inaccuracies in the state courts' discussion of this issue. Lori Galloway/Lamarca had made inconsistent statements and posed an ethical dilemma for Lamarca's attorneys.[7] (C5, 618-19). McClure testified at the evidentiary hearing, that she [Lori Galloway/Larmarca] provided the defense with two different statements. (C8, 1214). Finally, as noted by the trial court, Lamarca's own trial testimony

---

[7] Lamarca was informed by investigator Braun regarding Lori [Lamarca} "that she claimed the Defendant bragged to her son and to King about the killing." (C8, 1211).

was that he arrived in Washington unannounced. (A30, 1117). Eide testified during the evidentiary hearing: "The argument that he fled could also be consistent with what he said occurred.  In that Tonya told him that she was going to blame it on him--after killing Kevin. And that he left. So, the flight was not a big deal taken in the context of what he testified to." (C5, 619).

Lamarca attempts to bolster the testimony of Lori Lamarca/Galloway by stating "Tina Lamarca also knew of Lamarca's plan to leave Florida for the State of Washington and could have rebutted Brown's testimony while corroborating Galloway's." (Third Amended Petition at 24).  However, Lamarca failed to call Tina to testify at the evidentiary hearing.

Lamarca failed to establish either deficient performance or resulting prejudice based on defense counsel's failure to call Lori Lamarca/Galloway as a witness. Since the Florida courts identified the proper federal precedent and applied a reasonable interpretation of the facts in denying his claim, Lamarca is not entitled to relief on this claim.

## f.  Forensic Evidence

## i).  the alleged sexual battery

Lamarca, largely repeating his allegation that counsel was ineffective for failing to effectively impeach Tonya, asserts that trial defense counsel should have called a forensic expert to testify on the absence of physical evidence of rape. Lamarca incorrectly asserts that evidence collected from the scene of the rape and tests upon Tonya Lamarca all "came back negative or inconclusive." (Third Amended Petition at 25). In fact, there was physical evidence of rape, corroborating Tonya's testimony. Genetic material from saliva taken from Tonya's left breast was consistent with a mixture between Lamarca's and Tonya's genetic profile. (C3, 433-34). The chance of anyone at random having this profile was

"approximately one in 390." [8] (C3, 435). Thus, if Livingston, the FDLE expert, had been called to testify at trial, she would have provided strong evidence to corroborate the sexual battery of Tonya. Livingston's testimony at the evidentiary hearing showed that it is highly likely Lamarca's saliva was on Tonya's breast. Moreover, the S.A.V.E. examination revealed "fresh injuries" to Tonya -- redness in the vaginal and anal areas. (C5, 594-95). Eide also noted that there was some evidence of strangulation, consistent with Tonya's claim that Lamarca grabbed her around the neck, kicked in the door, and dragged her inside the house. (C5, 595). Tonya's testimony was credible and supported by physical evidence.[9]

Once again, Lamarca apparently attempts to raise a *Giglio* claim based upon the testimony of a crime scene technician. (Third Amended Petition at 26). However, Lamarca's claim in state court did not include this specific allegation (C1 at 32-33) and this claim cannot be raised for the first time in federal court. It is unexhausted and procedurally barred. The state trial court rejected Lamarca's ineffective assistance claim, stating, in part:

> ...Ms. Livingston explained that her testing revealed that the saliva from the swab of Tonya Flynn's face belonged to Tonya Flynn, and that the saliva from the swab of her breast was deposited by more than one donor. Ms. Livingston explained that Tonya Flynn and the defendant were both possible donors of the saliva from the swab of the breast, but that Kevin and Jasmine Flynn were conclusively eliminated as donors.
>
> As previously mentioned, a review of closing arguments reflects that Mr. Eide extensively argued the lack of DNA evidence surrounding the sexual battery (see analysis under claim (3). In conclusion, the court is unable to

---

[8] In other words, there is a .00256 [1/390] chance of finding someone with that genetic make-up in the general population.

[9] Lamarca apparently believes there can be no sexual assault without a semen deposit, a contention without support in the law or common sense. Moreover, Lamarca's allegation that the Pasco rape charge was dropped due to the lack of physical evidence has no record support and is incorrect.

conclude that Mr. Eide was deficient under *Strickland* in failing to call an expert, such as Ms. Livingston. Moreover, given the extensive argument by Mr. Eide on the lack of DNA evidence during closing arguments, the court cannot conclude that the defendant was prejudiced by the failure of Mr. Eide to call an expert on this issue.

(C3, 375)

The Florida Supreme Court affirmed the state trial court, stating:

Finally, defense counsel testified that his decision not to call Suzanne Livingston was strategic. Livingston, the Forensic Services Director for the Florida Department of Law Enforcement, performed DNA testing in regard to Tonya's sexual battery claim. The report Livingston filed contained some information that might have been useful in impeaching Tonya's claims of sexual battery, and Lamarca now alleges that defense counsel was deficient for not calling her to testify at trial. At the evidentiary hearing, counsel testified that he did not call Livingston to testify because he did not want to open the door for the State to admit evidence that would have bolstered Tonya's testimony. Before the guilt phase, defense counsel had filed a pretrial motion in limine to prevent Tonya's testimony. The trial court ruled that Tonya's testimony would be admitted for the limited purpose of placing the murder weapon in Lamarca's possession. Defense counsel testified at the evidentiary hearing that he did not want to expand this limitation by admitting too much evidence impeaching Tonya's testimony. Moreover, if defense counsel had called Livingston to the stand, the State could have questioned her about other aspects of her report, which contained highly incriminating evidence supporting Tonya's claim. The trial court found that defense counsel knew the importance of Tonya's sexual battery claim to Lamarca's case. In his closing argument, counsel extensively argued the lack of DNA evidence supporting Tonya's testimony. Therefore, defense counsel was not deficient in failing to call an additional expert to confirm this.

*Lamarca,* 931 So. 2d at 849.

Eide argued the lack of corroboration for the rape in closing argument to the jury.

Moreover, while Livingston could testify she did not find Lamarca's semen on Tonya or the

bed sheets, her testimony on saliva and genetic testing provided support for Tonya's

assertion that Lamarca sexually assaulted her. Thus, the state courts found that Eide made

a reasonable tactical decision not to present such testimony. These conclusions are

findings of fact. *Bolender v. Singletary*, 16 F.3d 1547, 1558 n.12 (11th Cir. 1994). Lamarca

must show that these findings were incorrect or unreasonable by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Herring v. Sec'y, Dept. of Corr.*, 397 F.3d 1338, 1342 (11th Cir. 2005).  Lamarca has not done so.

The record provides ample support for the state court findings that counsel made a well-considered tactical decision not to call Livingston to testify. Such a tactical decision is virtually immune from collateral attack. *See Conklin v. Schofield*, 366 F.3d 1191, 1204 (11th Cir. 2004)("which witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and it is one that we will seldom, if ever, second guess"); *Chandler v. United States*, 218 F.3d 1305, 1324-25 (11th Cir. 2000)(decision not to present character witnesses reasonable one where such witnesses might be exposed to cross-examination revealing that petitioner gave a .357 handgun to his son and that petitioner had been implicated in the murder of a missing "dope stealer."). The Florida courts applied the appropriate Supreme Court precedent [*Strickland]* and reached a reasonable conclusion under the facts of this case. Consequently, Lamarca is not entitled to relief on this claim.

**ii). The ballistics evidence**

Lamarca failed to present any evidence to support his claim that his defense attorneys were ineffective for failing to investigate or effectively cross-examine the State's ballistics expert and the state trial court summarily denied this claim at the close of evidence at the evidentiary hearing. (C2, 223). The Florida Supreme Court affirmed on appeal, stating:

> Lamarca also claimed his counsel was ineffective for failing to call the State's ballistics expert, Dominic Denio, to testify to the fact that gunpowder was evident only on the passenger's side door. Lamarca  failed to support this claim at the evidentiary hearing, and the trial court appropriately dismissed it without further consideration. Even if Lamarca had raised it, it would have been without merit because defense counsel's decision not to call

> Denio was reasonable. The evidence presented at trial established that Tonya drove Lamarca to Joseph's [Lamarca][10] home after Lamarca returned from shooting Kevin. The gunpowder on the passenger's side door, then, could have incriminated Lamarca.

*Lamarca v. State*, 931 So. 2d 838, 849-850 n.7 (Fla. 2006).

Lamarca fails to acknowledge and counter, the Florida Supreme Court's rejection of this claim, and, as noted above, Lamarca did not offer the testimony of a ballistics expert during the evidentiary hearing. Moreover, the lack of residue on the passenger's side of the car was not exculpatory. As defense counsel Eide testified, this was the same car Lamarca drove back to the bar from his trailer home [the murder scene] to "pick up" Tonya. Gunshot residue on the driver's side of the car Lamarca was driving immediately after the murder would not, as Eide recognized, impeach Tonya. (C5, 599-600). Thus, the record supports the Florida Supreme Court's decision. Since Lamarca has failed to point to any adverse Supreme Court precedent on this issue, or to factual inaccuracies in the state court's opinion, this claim does not warrant relief.

**g. Steve Slack**

Lamarca again mentions Steve Slack, as he did above, under his claim that counsel was ineffective for failing to effectively cross-examine Tonya Flynn. This claim has no merit. Counsel investigated the possibility of calling Slack to testify, but thought the risk of cross-examination outweighed any potential benefit to be gained from Slack's testimony. The state trial court denied relief on this claim after hearing testimony from Lamarca's defense attorneys and Steve Slack during the evidentiary hearing. In denying this claim, the trial court stated in part:

---

[10] Joseph Lamarca, Sr. is Anthony Lamarca's father.

Mr. Eide was questioned at length as to why he failed to call Slack as a witness. Mr. Eide explained that another witness, Detective Stacy Morrison, testified in her deposition that Tonya did tell Slack that she was raped by the defendant. Further, Mr. Eide explained that Slack admitted to Detective Michael Madden, on December 5, 1995, that Tonya told him that the defendant raped her. State's Exhibit #12, which is Detective Madden's supplementary report, confirms Eide's testimony.

As such, Mr. Eide explained that he engaged in a balancing act with regard to "outcry witnesses," such as Slack, and that he was forced to weigh their credibility against the value of their testimony. Mr. Eide explained that Slack had been drinking alcoholic beverages that night--in fact, Slack indicated that he had 8 beers that night in his deposition. He further indicated that Slack had always maintained that Tonya was "very upset" that night, which only helped to confirm Tonya's testimony that she was raped.

In the end, Mr. Eide made a tactical decision not to call Slack based on credibility, based on the fact that he was drinking heavily that night, and based on the fact that he could have been impeached by Detective Madden and/or Detective Morrison. [Transcript from June 27, 2003: Pages 74-75]. The court finds that Mr. Eide's explanation was well within the range of prevailing professional standards. Moreover, CCRC has failed to show, as required by *Strickland*, that Mr. Eide's tactical decision not to call Slack was deficient. *Spencer v. State*, 842 So. 2d 52, 62 (Fla. 2003) ("This court has held that defense counsel's strategic choices do not constitute deficient conduct if alternative courses of action have been considered and rejected.").

(C3, 370-72).

The Florida Supreme Court affirmed the state trial court:

The decision not to call James Zaccagnino and Steven Slack to testify was likewise a reasonable strategy. At the evidentiary hearing, defense counsel testified that he chose not to call these witnesses because he did not believe either of them was credible. He believed Zaccagnino's hearing difficulties and significant prison record made him a poor witness. Furthermore, counsel thought the uncontroverted fact that Slack had been drinking when he spoke with Tonya and that Slack contradicted himself in statements made to law enforcement officers rendered him not credible. These facts were substantiated at the evidentiary hearing. This claim was properly denied. *See Marquard*, 850 So. 2d at 428-29 (denying ineffective assistance claim for failing to call a witness when defense counsel did not find the witness credible).

*Lamarca v. State*, 931 So. 2d at 849.

The state trial court analyzed the testimony from the evidentiary hearing and concluded that defense counsel made a reasonable tactical decision not to call Steve Slack. Since trial defense counsel investigated the witness, decided not to call him, and provided a rationale for his decision, his decision is almost immune from post-conviction challenge. *Strickland,* 466 U.S. at 690-91 ("Strategic choices made after thorough investigation of the law and facts relevant to plausible options are virtually unchallengeable.").

Eide recognized that Slack could offer potentially damaging testimony. Slack had been drinking on the night of the murder. At the evidentiary hearing, Slack testified that Lamarca was mad or upset when he left the bar prior to the murder, and that Tonya was upset when she returned to the bar. (C11, 1528). In addition to noting that Tonya was upset, Slack testified that Tonya said that Lamarca had raped Tina Lamarca. (C5, 659). Moreover, Slack apparently told Detective Madden that Tonya did tell him she [Tonya] had been raped, and Eide was aware the State might call Madden in rebuttal. (C5, 649-50; C11, 1529). Eide had ample reason not to call Steve Slack to testify at trial.

Lamarca has failed to cite any clearly established federal law which establishes that the state courts' resolution of this claim was improper or incorrect under the AEDPA standard.

## 2. Trial Counsel Failed to file a Motion To Suppress

Lamarca next claims his attorneys were ineffective for failing to move to suppress evidence seized from Joseph Lamarca's [Anthony Lamarca's father] home after the murder. Lamarca provides no record cites to support his version of the facts. Lamarca does refer to a deposition of his father, Joseph Lamarca, which was admitted into evidence at trial.

However, at trial, the defense presented no relevant, admissible, testimony to show that Joseph Lamarca's consent to the search was involuntary. In denying this issue, the state trial court stated:

> ...Mr. Eide explained, however, that after conducting legal research and reviewing statements made by Joseph and Angela Lamarca, he concluded that the defendant lacked standing to file the motion [to suppress]. Mr. Eide testified that the defendant [Lamarca] agreed with his conclusion. At the [evidentiary] hearing on June 27, 2003, Mr. Eide again confirmed that he and the defendant discussed the filing of a motion to suppress, and that it was agreed that the testimony of the defendant's father and sister would not permit a factually sound basis on which to predicate the motion. [page 68]. Mr. Eide explained that such a motion would have been frivolous and that it was unethical to file frivolous motions.
>
> The evidence corroborates Mr. Eide's testimony. State's Exhibit #28, which contains a copy of handwritten notes authored by Nora McClure, reflects that the following occurs during a jail visit on September 12, 1997: "Ron [Eide] told Tony [the defendant] he didn't believe we could file Mot to Suppress b/c his dad had given sworn testimony that contradicted his 'standing' issue. He sd [said] he was ok w/'that.'"
>
> The court finds that CCRC has failed, at the hearing and in its amended motion, to show or even allege that Mr. Eide's legal research was erroneous. Nor has CCRC presented any testimony to contradict the facts upon which Mr. Eide's research was based. Accordingly, CCRC has failed to demonstrate that either Mr. Eide or Mrs. McClure rendered deficient performance in failing to file a motion to suppress. This claim fails under *Strickland*, and is therefore denied.

(C3, 359-60)

The Florida Supreme Court affirmed the denial of post-conviction relief:

> Lamarca also asserts that his counsel was deficient for not filing a motion to suppress the .22 caliber rifle seized from Joseph Lamarca's home. Lamarca's defense counsel testified that filing a motion to suppress would have been frivolous because Lamarca lacked standing to contest a search of his father's, i.e., Joseph Lamarca's, residence, [n6] and Lamarca presented no evidence to rebut this. Defense counsel is not deficient for failing to abide by a defendant's request when the request violates an ethical rule. *Lee v. State,* 204 So. 2d 245, 249 (Fla. 4th DCA 1967) (recognizing that an attorney's refusal to file a frivolous appeal at the defendant's request did

not warrant relief in a postconviction proceeding). Therefore, this claim is without merit.

*Lamarca v. State*, 931 So. 2d at 848 (footnote omitted).

The defense did not offer the testimony of Anthony Lamarca's sister or father to show that Anthony Lamarca had standing to contest the search or to show that Joseph Lamarca's consent to search was involuntary. Rather, the defense presented the testimony of Anthony Lamarca's brother, Joseph Lamarca, Jr., who had mental problems and who Anthony Lamarca had led the defense attorneys to believe would be of no help at all to the defense.[11]

Joseph Lamarca, Jr. testified during the evidentiary hearing that his brother, Anthony Lamarca, would check up on him "mostly every day" in 1992 and 1993. However, Anthony Lamarca was incarcerated in 1992 and 1993. (C7, 931). Thus, Joseph Lamarca, Jr.'s testimony that Anthony Lamarca had a key and was allowed in the house during the relevant period is highly suspect.

Eide testified that Lamarca's access to the house was more limited than Anthony Lamarca had indicated, based on Eide's conversations with Joseph Lamarca, Sr. and Angela Lamarca, Anthony Lamarca's sister. Anthony Lamarca's father told Eide that Anthony Lamarca he did not have a key to the house. (C5, 580; C11, 1550). Even if Lamarca were allowed as a visitor in the house, that fact alone would not provide Anthony Lamarca standing to challenge the search. Anthony Lamarca did not have a room in the house, was not living there and did not have any other possessory interest that might

---

[11]  Lamarca told the defense team that his brother was mentally ill, that he had killed people, pled insanity, and been hospitalized. (C8, 1190).

provide standing.[12]  *See Rakas v. Illinois*, 439 U.S. 128, 143 (1978)("To successfully claim the protection afforded by the Fourth Amendment, a defendant must demonstrate that he personally has an expectation of privacy in the place searched and that this expectation is reasonable.").

At the time the house was searched, Anthony Lamarca had left the house and therefore had no expectation of privacy in it. Moreover, Anthony Lamarca abandoned the rifle in his father's home and his father's consent to search was not shown to be invalid. Consequently, Eide's testimony that he did not file a motion to suppress because the motion would be frivolous is supported by the record.  The defense presented nothing during the evidentiary hearing to show that counsel's performance in failing to file the suppression motion constituted deficient performance, or, that Anthony Lamarca was prejudiced by the alleged deficiency. Lamarca has failed to cite any constitutional authority to show that the state courts' resolution of this issue was unreasonable under the AEDPA standard.

Ground One does not warrant habeas relief.

## GROUND TWO

**PETITIONER'S DUE PROCESS RIGHTS WERE VIOLATED WHEN THE STATE FAILED TO DISCLOSED EXCULPATORY EVIDENCE TO THE DEFENSE AND PRESENTED FALSE AND MISLEADING TESTIMONY IN VIOLATION OF PETITIONER'S FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

---

[12] Lamarca broke in the door to his father's home and after taking coins and raping Tonya, left the home, leaving the murder weapon behind. Whatever privacy interest, if any, Lamarca possessed in the home, ended upon his leaving the home. *See generally Minnesota v. Carter*, 525 U.S. 83, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998). The father, who had a privacy interest in the home he owned, executed a waiver and the rifle was recovered.

Lamarca next asserts that the State presented false testimony from Hughes. However, the defense did not show that James Hughes' testimony was false. The defense simply presented a long time "prison pal" of Lamarca's, Zaccagnino, to testify on Lamarca's behalf. A factual dispute among witnesses does not establish that James Hughes' testimony was false, a fact recognized by the trial court in denying this claim : "The court is not willing to find that the State permitted the false testimony of Hughes simply because Zaccagnino, a convicted felon, maintains that Hughes was lying. Hence, the *Brady and Giglio* claim [sic] are denied as CCRC failed to meet its burden of proof." (C3, 369). This credibility determination was within the province of the state trial court. It is a factual finding which Lamarca must show is incorrect by clear and convincing evidence. He has failed to meet this burden.

Lamarca asserts that the State failed to disclose some type of deal with witness Hughes in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The state trial court rejected this claim , stating:

> ...At the evidentiary hearing, John Burns, an Assistant State Attorney from Charlotte County, testified that Hughes had pending charges out of that county at the time of the investigation and trial in this case. Burns, testifying from his progress notes about the case (see Defense Exhibits #4 and #5), testified that the defendant received a downward departure sentence even though no promises were made by the State (i.e., note dated November 25, 1997). Burns explained that Hughes' public defender, Mr. Cooper, cited Hughes' cooperation in the present case to receive the mitigated departure (substantial cooperation with law enforcement). Although there were references to possibly qualifying and sentencing Hughes as a habitual felony offender (i.e., emails to Mr. Delassandro, the State Attorney), Burns explained that although a defendant meets the statewide criteria for habitualization, one is not sentenced as such unless he or she qualifies under the office's internal policy enacted by the elected state attorney. Burns was unequivocal in his testimony that he never contacted anyone in the Sixth Circuit about an agreement, and that no promises were ever made to Hughes. Judge Sean [sic] Crane testified to the same effect. Because CCRC

failed to meet its burden of proving that Hughes received anything of benefit in exchange for his testimony, this aspect of the claim is hereby denied.

(C3, 369).

The Florida Supreme affirmed the trial court, stating:

Finally, the record does not support Lamarca's claim that the State suppressed deals made with either Hughes or Smith in exchange for their testimony. The trial court's order denying these claims is supported by competent, substantial evidence. While the record shows that the attorneys working on Hughes' and Smith's respective trials were aware that each defendant participated in Lamarca's trial, the record refutes Lamarca's allegations that either man's testimony in Lamarca's case resulted from a deal with the State. Because the record contradicts Lamarca's allegations that either man's testimony was part of a deal, we affirm the trial court's denial of this claim. *See Mansfield*, 911 So. 2d at 1178 (denying *Giglio* claim alleging witness lied by testifying that he did not expect to receive any benefit from testifying because the "postconviction court found there was no evidence that [the witness] was promised any benefit in exchange for his testimony").

The trial court found no evidence that Hughes received a benefit for testifying in Lamarca's case, and this finding is supported by competent, substantial evidence. The assistant state attorney who prosecuted Hughes' case in Charlotte County at the time of Lamarca's trial testified at the evidentiary hearing that he never made a deal with anyone in Pinellas County. His handwritten notes indicate that he was aware Hughes was involved in a trial in Pinellas County but that he never spoke with anyone in Pinellas County about securing a deal. While Hughes did receive a downward departure, there is no evidence this sentence was promised to Hughes in advance or given in exchange for Hughes' testimony in Lamarca's case. In fact, the assistant state attorney assigned to Hughes' Charlotte County trial did not even participate in the negotiations regarding Hughes' ultimate sentence. He was instructed to adhere to the State's original offer, which was in accordance with the office's guidelines and not in accordance with any deal. At the evidentiary hearing, he testified that Hughes received a lesser sentence only after tough negotiations between a public defender who had a reputation for "moving cases" and an assistant state attorney with more authority than he to negotiate pleas.

*Lamarca v. State*, 931 So. 2d 838, 852-853 (Fla. 2006).

Lamarca implies that Hughes received a deal in exchange for his testimony in this case. At no point did anyone in the Pinellas County State Attorney's Office contact Burns

and ask him to give Hughes any consideration "whatsoever." (C5, 685). Hughes scored in the prison range of 40.5 months to 67.5 months. (C5, 674). Ultimately, after Hughes testified in the Lamarca case, the file reflected that Assistant State Attorney Kershey spoke to Shawn Crane who verified that Hughes had testified. However, the file noted that he was not given any promises by the State. (C5, 684-85). In November and December [the period of Lamarca's trial] Hughes' defense attorney, Cooper, was still attempting to negotiate a plea for Hughes. (C5, 685).

Hughes' testimony that he received no benefit nor had any deal with the State was true at the time he testified at Lamarca's trial. There was never any agreement or deal with Hughes. (C6, 820). At the evidentiary hearing, Judge Shawn Crane, a former prosecutor, noted that in Hughes' deposition, Hughes stated that he hoped to get a benefit from testifying and that the State had already offered him 42 months. (C6, 828). However, Judge Crane testified unequivocally that there was no deal or agreement with Hughes. (C6, 829).

The fact that Hughes' defense attorney used Hughes' cooperation, *after Lamarca's trial ended,* in an effort to negotiate a below-guidelines sentence, does not establish that any false testimony was presented by Hughes at Lamarca's trial. Lamarca failed to establish that there was an undisclosed agreement at the time Hughes testified or that any of his testimony was false.  Therefore, this claim does not warrant relief. *See Tompkins v. Moore*, 193 F.3d 1327, 1340 (11th Cir. 1999)("Tompkins has failed to meet the threshold requirement that he show false testimony was used.").

Lamarca's reliance on *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959) is misplaced. In *Napue* the State had promised to recommend a reduction in the testifying witness' sentence in exchange for his testimony, a promise that was not disclosed

at the time of trial. The most Lamarca could show in this case is that Hughes hoped to use his cooperation in Lamarca's case to his benefit, but, that he had not been promised anything at the time of Lamarca's trial. Lamarca's speculation regarding the potential enhanced sentence Hughes might have received does not establish that Hughes received any agreement or benefit from the State. *See Hays v. Alabama*, 85 F.3d 1492, 1499 (11th Cir. 1996)(rejecting as speculative defendant's claim that since cooperating witness was not charged with murder he must have had some sort of deal or agreement with the government).

Lamarca mentions his prison friend Zaccagnino,  and asserts that law enforcement officers attempted to dissuade him from testifying at trial. (Third Amended Petition at 36). It is unclear how Zaccagnino could support a Brady claim where trial counsel was not only aware of him, but interviewed him at the time of trial. Zaccagnino did not tell Pinellas Detectives that Hughes asked him to fabricate the story about Lamarca. To the contrary, Zaccagnino admitted that he did not tell the detectives that Mr. Hughes asked him to "fabricate a story." (C6, 783). The defense knew the same information the State knew at the time of trial -- that Zaccagnino claimed he did not hear or was not present when Lamarca made the threat to kill his son-in-law, Kevin. Consequently, the State did not withhold any allegedly favorable evidence from the defense relative to Zaccagnino.

Similarly, it is not clear why Lamarca mentions Lori Lamarca/Galloway under this claim. She, like, Zaccagnino was known to the defense at the time of trial. Lori had made inconsistent statements and the defense decided not to call her at trial.[13]

_____

[13] Lamarca did not establish any prosecutorial misconduct with regard to this witness in the state trial court. Prosecutor Martin acknowledged some discussion of marital privilege, noting that Lamarca and Lori Galloway/Lamarca were "prison pen pals" and that Lamarca married Lori after his arrest in Washington. (C7, (continued...)

The State court rulings were supported by the evidence and Lamarca has not cited any controlling Supreme Court precedent which mandates reversal of the rulings.

Lamarca's claim that *Giglio and/or Brady* were violated by witness Jeremy Smith's testifying he received no benefit in exchange for his testimony is without merit. The state courts rejected Lamarca's claim that *Brady and Giglio* were violated when Jeremy Smith testified that he received no deal or benefit for testifying against Lamarca. In rejecting this claim, the state trial court stated, in part:

> The transcript from the March 22, 1996 hearing (State's Exhibit #15B) reflects that Judge Crane testified that Jeremy Smith had cooperated in the investigation by giving a statement but that the trial was not scheduled anytime soon. Judge Crane unequivocally indicated that no promises were made of any kind in exchange for Jeremy Smith's cooperation, and that there were no "winks of the eye." Because the trial had not yet occurred, Judge Villanti was unwilling to depart at that time. Furthermore, Judge Villanti did not commit to a downward departure sentence for the future, but stated that Judge Im[14] could reargue his case at a later time. Thereafter, Judge Im successfully obtained a continuance to determine if a plea agreement could be negotiated. Jeremy Smith was subsequently sentenced in March 1996 to 29 months prison, which was a guidelines disposition.
>
> With Defense Exhibit #7 in hand, CCRC questioned Judge Crane at the hearing as to whether there were any promises made in exchange for Jeremy Smith's testimony. Judge Crane categorically denied that there were any deals, promises, or "winks of the eye." In this regard, Judge Crane's testimony was confirmed by the transcript of the March 22, 1996 hearing. Judge Crane further explained that he did not recall the message left by Florence Smith, but that even though the message was left, there were never any promises or deals made.

---

[13](...continued)
914). But, after she moved back to Florida, Martin believed that they had divorced. (C7, 914). Martin denied that he threatened Lori Galloway in order to change or influence her testimony. (C7, 916-17). A phone call Martin made to Lori Galloway was not made to explain or even discuss marital privilege; it was to determine whether or not she received a phone call from Angela regarding Lamarca's being wanted for murder and whether or not she passed this information on to Darren Brown. (C7, 917-18). Martin denied that he ever threatened Lori Galloway with arrest or prosecution if she failed to testify against Lamarca. (C7, 918).

[14] Judge Im, prior to becoming a judge, was appointed to represent Jeremy Smith.

CCRC has failed to show that there were any promises made to Jeremy Smith. Moreover, CCRC has failed to show that the State withheld any evidence of a "deal" between the State and Jeremy Smith. *Wright v. State*, 581 So. 2d 882, 883, 887 (Fla. 1991) (affirming that "speculative" claim under *Brady* does not warrant relief). Finally, CCRC has failed under *Giglio* to demonstrate that the State permitted false testimony by allowing Jeremy Smith to testify at trial that he had received no deals or benefits in exchange for his testimony. *Ventura v. State*, 794 So. 2d 553, 562-564 (Fla. 2001). Accordingly, this claim is denied.

(C3, 373-374).

The Florida Supreme Court affirmed the trial court, providing the following analysis:

In regard to Smith's trial, the record fails to establish that any benefit he received from testifying at Lamarca's trial came as the result of a deal. While the trial judge delayed Smith's sentencing hearing in order to allow Smith's defense counsel to put forth evidence that Smith was participating in Lamarca's trial, Lamarca failed to put forth any evidence establishing that this benefit was promised in advance or was part of a deal. At the evidentiary hearing, Smith's defense counsel at this sentencing hearing testified that the trial judge did not agree to lessen Smith's sentence based on evidence that Smith participated in Lamarca's trial. Moreover, the transcript from the sentencing hearing confirms this. While both an assistant state attorney and a state investigator assigned to Lamarca's case testified at Smith's sentencing hearing that Smith had cooperated in Lamarca's case, both also made it clear that their testimony at this hearing was not part of any deal. The assistant state attorney assigned to Lamarca's case specifically stated on the record at Smith's sentencing hearing, "There's no deal. No wink of the eye or anything with regard to Mr. Smith. He's here before Your Honor as a straight-up plea as far as we're concerned." Lamarca has not established that either Hughes' or Smith's testimony came as a result of a deal; therefore, we affirm the trial court's denial of this claim.

*Lamarca v. State*, 931 So. 2d at 853.

The state trial court found there was no undisclosed "deal" or agreement with Jeremy Smith. Lamarca fails to acknowledge the State court ruling, and does not show, by clear and convincing evidence, that the factual findings are erroneous. Smith received a guidelines sentence. Prosecutor Crane made a short factual statement at Smith's sentencing noting Smith's cooperation in the Lamarca case. *See McCleskey v. Kemp*, 753

F.2d 877, 883-84 (11th Cir. 1985)(where the court held that a detective's statement that he would speak a "word" on the witness' behalf regarding pending charges fell far short of the type of "understanding" contemplated in *Giglio*). The state trial court reviewed the transcript of that hearing and confirmed that there was no benefit, deal, or "winks" regarding the disposition of Smith's charge. The testimony from the evidentiary hearing and the transcript of the Pasco sentencing confirms that there was no deal made in exchange for Smith's cooperation. (C12, 6-19). *See Tarver v. Hopper*, 169 F.3d 710 (11th Cir. 1999)(where prosecutor testified that there was no deal in exchange for witness' testimony and statement that witness' testimony "would be taken into consideration" on pending charges was "too preliminary and ambiguous to require disclosure").

However, assuming that some form of *Brady* violation can be inferred from Smith's testimony, there was no reasonable probability of a different result in Lamarca's case. Smith had already been sentenced at the time he testified in Lamarca's trial, was impeached by the defense on the basis of his conviction, his drug usage, and the fact he sought favorable treatment on his violation of probation charge. Smith made a full statement to the police prior to the assistant state attorney's notifying the sentencing court of his cooperation. Moreover, Smith had already served his sentence at the time of Lamarca's trial. (A29, 922-950). Consequently, Smith had no motivation at the time of trial to skew his testimony in the State's favor. *See State v. Lewis*, 838 So. 2d 1102 (Fla. 2002)(even assuming the State failed to disclose potential impeachment evidence, given the limited value of this evidence, and, the fact testifying witness had already been sentenced, and any motivation for skewing his testimony would have been limited, there was no reasonable probability of a different result).

Ground Two does not warrant habeas relief.

### GROUND THREE

**PETITIONER'S DUE PROCESS RIGHTS UNDER THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WERE DENIED BY THE TRIAL COURT'S LIMITATION AND EXCLUSION OF EVIDENCE AND ABRIDGEMENT OF HIS CROSS EXAMINATION OF TONYA FLYNN WHICH WAS RELEVANT TO MR. LAMARCA'S DEFENSE.**

Lamarca claims that the trial court violated his due process rights when the court limited his ability to present evidence of alleged marital difficulties between Tonya and her husband, Kevin. At trial, the jury was informed that, approximately six weeks before Kevin Flynn was murdered, Tonya and Kevin separated for a week, but they had reconciled. On the night he was killed, Kevin and Tonya had been together, celebrating her 20th birthday at a local pub. During a pre-trial hearing on the State's motion in limine, the defense argued that (1) Lamarca's own [unsubstantiated] allegation that Tonya and Kevin were getting a divorce and (2) evidence that Tonya had an affair with Dwayne Frederick during their separation were relevant to show that Tonya had some animus against Kevin and could have participated in the crime or committed it. ([Trial record] A22, 3289-3290). Lamarca did not claim in the trial court, that any such limitation on evidence violated his right to Due Process under the Constitution.[15]

_____

[15] The State argued on direct appeal that the due process error was not preserved. At the pre-trial hearing on the State's motion in limine, Lamarca urged a relevancy-based claim; the defense did not assert nor argue any due process violation. (A22, 3288-92). More importantly, at the time of trial, the defense did not raise any complaint at all, much less an alleged due process violation. The defense did not question Tina Lamarca, Tonya Flynn or Anthony Lamarca at trial about Tonya's separation from her husband and the defense did not request the opportunity at trial to ask any witnesses about Tonya's reason for dissatisfaction with her husband nor her affair during her separation. (A27, T.727-28, T.774-88; A30, T.1051).

In order to preserve an issue for appellate review, the specific legal argument or ground upon which it is based must be presented to the trial court. _Bertolotti v. Dugger_, 514 So. 2d 1095, 1096 (Fla. 1987); _Occhicone v. State_, 570 So. 2d 902 (Fla. 1990).

However, the Florida Supreme Court did not address the State's procedural bar argument, and, instead, found any error in limiting the evidence was harmless. *C.f. Davis v. Singletary*, 119 F.3d 1471, 1479 (11th Cir. 1997)("It is settled that once the state courts have ignored any procedural bar and rejected a claim on the merits--not in the alternative but as the only basis of decision -- that claim is not barred from federal habeas review.").

The Florida Supreme Court stated:

> The second issue for our consideration is whether the trial court abused its discretion in excluding defense evidence that might have shown that Tonya had a motive to commit the murder. We agree that the trial court abused its discretion. Evidence that the victim drank excessively, that Tonya wanted a divorce, and that she had sex with another man while she was briefly separated from the victim arguably tends to establish that she had a motive to kill the victim. *See State v. Savino*, 567 So. 2d 892, 894 (Fla. 1990). Moreover, the substance of the evidence did not seem likely to cause confusion or mislead the jury. The trial court, therefore, abused its discretion in excluding the evidence. *See Guzman v. State*, 644 So. 2d 996, 1000 (Fla. 1994)(explaining that courts "should be extremely cautious when denying defendants the opportunity to present testimony or evidence on their behalf, especially where a defendant is on trial for his or her life").
>
> In the instant case, the abuse of discretion amounts to harmless error. Evidence of appellant's guilt includes his statement five months before the murder that he wanted to kill the victim; he was seen several times with the firearm used to commit the murder; just before the murder he was seen by his neighbor entering his trailer with the victim and they seemed to be arguing; the victim was missing later that night; the police found the victim's body in appellant's trailer early the next morning; after departing the bar with the victim and in the victim's car, appellant returned to the bar alone and with the victim's car; upon seeing a policeman hours after the murder he fled; the night of the murder he told a friend that he killed his son-in-law, that it "sucked," but that he had to do it; and that he continued his flight to Washington State. Thus, there is no reasonable possibility that the error affected the verdict. *See State v. DiGuilio*, 491 So. 2d 1129, 1135 (Fla. 1986).

*Lamarca v. State*, 785 So. 2d 1209, 1213-1214 (Fla. 2001).

This matter was raised in the state courts and addressed as a matter of state law.[16] The Florida Supreme Court is the final arbiter of Florida law; federal courts must respect that law absent a constitutional violation. *Breedlove v. Moore*, 279 F.3d 952 (11th Cir. 2002); *Hunt v. Tucker*, 93 F.3d 735, 737 (11th Cir. 1996). Under *Brecht v. Abrahamson*, 507 U.S. 619, 113 S.Ct. 1710, 12 L.Ed.2d 353 (1993), constitutional error will be considered harmless in a habeas proceeding unless the error had substantial and injurious effect or influence on the verdict or sentence. As found by the Florida Supreme Court using a much more stringent standard for harmless error, any error in limiting evidence of marital difficulties between Tonya and the victim was harmless. *See Barclay v. Florida*, 463 U.S. 939, 958 (1983)(the Supreme Court recognized the Florida Supreme Court does not apply its harmless error analysis in an automatic or mechanical fashion, but rather upholds death sentences on the basis of this analysis only when it actually finds that the error is harmless).

Lamarca has failed to demonstrate that the Florida Supreme Court's harmless error analysis was inconsistent with any decision from the United States Supreme Court or was an unreasonable application of any such precedent. The sufficiency of the Florida Supreme Court's harmless error analysis is clearly established by a review of that Court's opinion.

Ground Three does not warrant habeas relief.

---

[16] It is doubtful that any restriction on evidence with such tenuous relevance would rise to the level of an error of constitutional dimension. *See Jamerson v. Sec'y, Dept. of Corr.*, 410 F.3d 682, 687-88 (11th Cir.2005)(noting that habeas proceedings are not forums to relitigate state trials and that "habeas proceedings are 'secondary and limited' ").

"[A]n error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment." (quoting *Brecht v. Abrahamson*, 507 U.S., 619, 637 (1993)).

## GROUND FOUR

**PETITIONER'S DUE PROCESS RIGHTS UNDER THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WERE VIOLATED BY THE TRIAL COURT'S ALLOWANCE AND ADMISSION OF CERTAIN COLLATERAL ACTS ATTRIBUTED TO THE PETITIONER THE IMPACT OF WHICH WAS MANIFESTLY PREJUDICIAL BEYOND ANY PROBATIVE UTILITY.**

Lamarca contends that admission of collateral crimes or Williams Rule evidence violated his constitutional right to a fair trial. *Williams v. State*, 110 So. 2d 654 (Fla. 1959). He does not state how his due process rights were violated by the admission of such evidence, or attempt to meet the stringent requirements under the AEDPA for granting relief to a habeas petitioner.[17]

While Lamarca couched his argument on direct appeal in terms of a violation of his due process rights, his entire argument was based on a state law assertion of evidentiary error. (A34, 40-48). Subject matter jurisdiction does not lie to address this ground, which presents a state law issue for which federal habeas relief is not available. In Florida, "similar fact" evidence of other crimes, wrongs, or acts is admissible when relevant to prove a material fact in issue, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, but it is inadmissible when the evidence is relevant solely to prove bad character or propensity. *Robertson v. State*, 829 So. 2d 901, 907 (Fla. 2002). In addition, "dissimilar fact" evidence may be admissible under Fla. Stat. § 90.402 (1997), which simply states that all relevant evidence is admissible except as provided by law.

---

[17] The state trial court did in fact exclude evidence that Lamarca sexually assaulted his other daughter, Tina, the month prior to raping Tonya and murdering Kevin Flynn.

A Florida prisoner's claim that evidence of uncharged crimes has been adduced in contravention of state law does not present a cognizable claim for federal habeas corpus relief. Moreover, whether a Florida court acted within its discretion in denying a mistrial motion complaining of admission of other crime evidence is solely a matter of state law. It is not the province of a federal court to reexamine state-court determinations on state-law questions. *See generally Estelle v. McGuire*, 502 U.S. 62, 72, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991)(emphasizing that the issue of whether similar fact evidence was improperly admitted at trial is a question of state law). In any case, even if this claim were not barred, the state courts' decision to admit this evidence was not unreasonable under clearly established Supreme Court precedent.

In deciding this issue, the Florida Supreme Court stated:

> The first issue for our review is whether the trial court abused its discretion in admitting collateral crime evidence. The admissibility of such evidence is within the discretion of the trial court and its determination shall not be disturbed absent an abuse of that discretion. *See Sexton v. State*, 697 So. 2d 833, 837 (Fla. 1997). "Discretion . . . is abused when the judicial action is arbitrary, fanciful, or unreasonable, which is another way of saying that discretion is abused only where no reasonable man would take the view adopted by the trial court." *Huff v. State*, 569 So. 2d 1247, 1249 (Fla. 1990).

> The admissibility of evidence generally turns on relevance:

> Our initial premise is the general canon of evidence that any fact relevant to prove a fact in issue is admissible into evidence unless its admissibility is precluded by some specific rule of exclusion.

> Viewing the problem at hand from this perspective, we begin by thinking in terms of a rule of admissibility as contrasted to a rule of exclusion. *Williams v. State*, 110 So. 2d 654, 658 (Fla. 1959). Evidence of other crimes or bad acts are admissible if relevant, i.e., if it is probative of a material issue other than the bad character of the accused. *See Hunter v. State*, 660 So. 2d 244, 251 (Fla. 1995). In *Hunter*, this Court explained:

Among the purposes for which a collateral crime may be admitted is establishment of the entire context out of which the criminal action occurred. *See also Ashley v. State*, 265 So. 2d 685, 693-94 (Fla. 1972)(holding that evidence of four other murders committed shortly after the murder for which defendant was tried was admissible). Inseparable crime evidence is admitted not under 90.404(2)(a) as similar fact evidence but under section 90.402 because it is relevant.

660 So. 2d at 251 (citations omitted). On the other hand, "relevant evidence is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence." § 90.403, Fla. Stat. (1995). All of the evidence presented in a prosecution "prejudices" the defendant; thus, the pertinent question is whether that prejudice is so unfair that it should be deemed unlawful. *See Wuornos v. State*, 644 So. 2d 1000, 1007 (Fla. 1994).

In the present case, the trial court did not abuse its discretion in admitting two pieces of inextricably intertwined evidence: (1) testimony that appellant told the victim that he had done something to Tina Lamarca-- appellant's stepdaughter--that caused her to cease living with him; and (2) testimony that appellant raped Tonya. The two pieces of evidence must be viewed together. The first piece of disputed testimony consisted of Tina affirming that there was an "incident" between appellant and herself and her testimony that what appellant "had done" to her prompted her to stop living with him. The appellant had allegedly raped Tina, although that was not expressly stated to the jury. Tina's testimony was relevant because it puts into context the victim's statement to appellant to keep away from Tonya. Absent the nexus to the "incident" between appellant and Tina, the jury would have been left wondering why the victim told appellant to stay away from Tonya. Thus, Tina's testimony was relevant to prove motive and premeditation, and was focused and limited.

The second part of the contested testimony was provided by Tonya, who stated that after appellant and the victim left the bar, appellant returned alone and told her that she had to meet the victim at appellant's relative's house. They drove there and found the house unoccupied, and appellant raped her. Afterwards, appellant asked Tonya to leave Florida with him and told her that her feelings for the victim would not last.

Evidence that appellant raped his daughter and did something to cause Tina to move out puts into context appellant's statements about his wanting Tonya to leave Florida with him and that her feelings for her husband (the victim) would not last. The testimony is therefore relevant to show appellant's motive in killing the victim--to have Tonya for himself. If the testimony as to the rape and Tina being forced to move out by appellant is

omitted, you simply have a father asking his daughter to leave Florida and stating that her feelings for her husband would go away. Thus, absent the testimony of Tonya and Tina relative to appellant's actions, it would not be clear that the father desired his daughter in a way that would exclude his son-in-law and why the son-in-law wanted to separate appellant and Tonya and told appellant-just hours before appellant killed him-that he could not be near his daughter because he knew of the "incident" with Tina. Thus, appellant's incestuous desire for his daughter and the victim's demand that appellant stay away are relevant to prove appellant's motive to kill his son-in-law. The motive contradicts the defense strategy of attempting to prove that Tonya killed her husband and tends to prove appellant's premeditation. Thus, the trial court did not abuse its discretion in admitting the evidence.

*Lamarca v. State*, 785 So. 2d 1209, 1212-1213 (Fla. 2001).

The Florida Supreme Court provided a thorough analysis of this issue under state law. Lamarca has once again failed to cite any federal precedent which suggests, much less establishes, that the Florida Supreme Court's analysis contravened clearly established Supreme Court precedent.

Although Lamarca asserts that the prosecutor misrepresented the collateral crimes evidence, he fails to support this claim with specific argument or facts. As noted by the State court, relevance, not necessity, is the standard for admissibility. The evidence need not prove the defendant's guilt of the charged offense if "it is in the nature of circumstantial evidence forming part of the web of truth" proving the defendant to be the perpetrator, *Bryant v. State*, 235 So. 2d 721 (Fla. 1970), or would "cast light" upon the character of the act under investigation. In the instant case, the State asserted that the evidence was inextricably intertwined and admissible to show the defendant's consciousness of guilt and to support evidence of motive and intent. This was a matter within the trial court's discretion and Lamarca failed to show an abuse of that discretion.

The rape of Tonya Flynn by Anthony Lamarca was inextricably intertwined with the murder of Tonya's husband, Kevin Flynn. The most obvious common thread is that these

individuals are all family members and Lamarca's acts all occurred within a relatively short period of time, as Lamarca's newly-rekindled relationship with his family began rapidly tdisintegrate.

On the night he was murdered, Kevin forbad Lamarca from being around his family. Kevin excluded Lamarca from seeing his daughter and granddaughter. Lamarca also needed Kevin's permission to obtain transportation. When Lamarca approached Tonya to ask for transportation, she deferred to Kevin, and it was Kevin who denied Lamarca's request for transportation. Kevin Flynn denied Lamarca access to Tonya and the baby, denied Lamarca access to Kevin's car, and, consistent with wanting Lamarca away from Tonya, Kevin agreed to drive Lamarca home. When they reached Lamarca's trailer home, Lamarca engaged in a heated argument with Kevin on the front steps of the mobile home. Kevin was shot twice in the head in the living room of the trailer.  His body was dragged into the back bedroom in an attempt to conceal his body from anyone outside. Lamarca then returned to Tonya and told her that they needed to meet Kevin and Tina in Hudson, which is located in Pasco County. Using that ruse, Lamarca succeeded in having Tonya drive to Hudson. When they arrived at Lamarca's father's Hudson home,  Lamarca kicked in the door, forced Tonya inside, and raped her.

Within a few hours of murdering his son-in-law, Lamarca continued his criminal acts by raping Tonya. Lamarca begged Tonya to leave the state with him and told Tonya her feelings for Kevin would not last more than another year. When Tonya said she was staying with her husband and daughter, Lamarca replied, "Don't think I'm sorry for anything I've done tonight, I meant it all from the bottom of my black ass heart." (A28, T 755). After the rape, Lamarca retrieved the rifle. This is the same firearm which ballistically matched the

bullets taken from Kevin Flynn's body. Lamarca threatened to kill himself and instructed Tonya to call the police, which she did. When the deputies eventually entered the house on Ideal Lane in Hudson, they found the gun used to murder Kevin Flynn. In the meantime, Tonya continued to search for Kevin. Kevin's body was eventually discovered inside Anthony Lamarca's trailer.

Florida courts have repeatedly approved the admission of highly prejudicial evidence, including evidence of the defendant's commission of other murders, when sufficient probative value has been shown. *See Fotopoulos v. State*, 608 So. 2d 784 (Fla. 1992); *Wuornos v. State*, 644 So. 2d 1000, 1007 (Fla. 1994)(finding relevance of six similar murders committed by Wuornos "clearly outweighs prejudice" of their admission). Admission of such relevant evidence is in accordance with established Eleventh Circuit precedent. *See Thigpen v. Thigpen*, 926 F.2d 1003, 1017 (11th Cir. 1991)(admission of prior conviction to prove motive). And, as noted above, Lamarca has not cited any clearly established Supreme Court precedent which suggests the Florida Supreme Court erred in deciding this issue.

Ground Four does not warrant habeas relief.

### GROUND FIVE

**PETITIONER'S DUE PROCESS RIGHTS UNDER THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WERE VIOLATED BY A REMARK BY THE PROSECUTOR INFERRING MR. LAMARCA'S PREVIOUS INCARCERATION ON AN UNRELATED CONVICTION CONTRARY TO A PRETRIAL ORDER IN LIMINE AS TO THIS FACT.**

Lamarca argues that his due process right to a fair trial was violated when an inadvertent question by the prosecutor implied that Lamarca was incarcerated at the time

he told James Hughes that he intended to kill his son-in-law.[18]  While Lamarca couches his argument in terms of a constitutional violation, this claim raises nothing more than an argument based on a state law evidentiary ruling.[19]

On the merits, the state trial court, in denying Lamarca's motion for mistrial, reasoned:

> And I believe that the question, having gone unanswered, did not plant any seeds or rise to the level, even in this type of case, that--that would create a mistrial situation.
>
> That one question, taken in conjunction with all of the other testimony that has been presented thus far in this case, some of the testimony and the evidence being very damaging and prejudicial to the defendant--as is all evidence and testimony presented by the State in any criminal case. Prejudicial, although relevant and legal, but still prejudicial to the defendant.
>
> And taken in totality of all the evidence that the jury has heard and the--the evidence that's been presented thus far, I feel that one question does not put us in a situation where that question and that alone having been heard by the jury is so prejudicial to the defendant as to not allow him to get a fair trial in this matter.

(A30, T1011-1012).

The Florida Supreme Court affirmed, stating:

> Appellant's third issue for our review is whether the trial court abused its discretion in denying the defense's motion for mistrial based on a question by the prosecutor that implied that appellant was in jail a few months before the charged murder. Prosecutorial improprieties "must be viewed in the context of the record as a whole to determine if a new trial is warranted. *Sireci v. State*, 587 So. 2d 450, 452 (Fla. 1991). Where the remark is "minimal," "inadvertent," and the jurors probably could have deduced the improperly stated information by other means, a mistrial is unwarranted. *Id.* at 452-53; *see Ferguson v. State*, 417 So. 2d 639, 642 (Fla. 1982)(holding

---

[18] Lamarca testified at trial and admitted that he had eleven prior felony convictions. (A30, 1067, 1074). James Hughes previously had testified at trial that in July 1995, that Lamarca stated that Lamarca was going to kill his son-in-law because his son-in-law had raped his daughter (A29, 870-73, 875-77).

[19] The due process argument was raised on direct appeal by Lamarca and therefore has been exhausted in state court. (A34, 60).

that state witness's misstatement that Amy first time in prison, all three of us was [sic] together"--which included the defendant-was "not so prejudicial as to warrant reversal").

In the present case, the trial court did not abuse its discretion in denying appellant's motion for mistrial based on the prosecutor's misstatement. Following cross-examination of a state witness (who on cross-examination identified a person named Zack as being present during a conversation between the witness and appellant) the prosecutor queried on redirect:

[STATE]: This gentleman named Zack, what was he doing time for?

THE COURT: Excuse me?

[DEFENSE]: Objection, your Honor.

THE COURT: Approach. (The following takes place at sidebar.)

THE COURT: Shawn, do you know what you just said?

[STATE]: Mr. Zaccarino-[sic]

THE COURT: You said, What was he doing time for?

[STATE]: Oh, . . . .

[DEFENSE]: Your Honor, we're going to move at this time for a mistrial . . . . The inference is obvious regarding the conversation and the location of the conversation.

[STATE]: Oh, I can't believe I said that. I don't know-that is unbelievable. I don't know if a curative-

THE COURT: No.

[STATE]: Doggone it.

THE COURT: I'll take the motion for mistrial under advisement and rule on it before the State rests.

[STATE]: Can I-maybe I can try to rehabilitate.

THE COURT: I will let you rephrase your question. And let's not say anything further about it.

-52-

The record is clear that the misstatement was inadvertent and that attention was not drawn to it. In context of the trial, the statement was not prejudicial since appellate testified during the guilt stage of his trial and admitted to eleven felony convictions. Thus, the jury could have safely inferred from properly admitted testimony that appellant had spent time in confinement. Put in context, therefore, it is clear that the above misstatement was hardly prejudicial as to warrant a new trial. The trial court's decision is therefore affirmed.

*Lamarca v. State*, 785 So. 2d 1209, 1214-1215 (Fla. 2001).

The state courts ruled that a mistrial was not warranted based upon the indirect reference to Lamarca's incarceration. A state court decision on the merits of a habeas petitioner's claim or claims is reasonable if it is "minimally consistent with the facts and circumstances of the case." *Hennon v. Cooper*, 109 F.3d 330, 335 (7th Cir. 1997). "[F]ederal courts must respect all reasonable decisions of state courts." *Drinkard v. Johnson*, 97 F.3d 751, 769 (5th Cir. 1996). Habeas relief is only warranted where there can be no debate among reasonable jurists. *Id.*

Lamarca failed to establish that the factual findings are clearly erroneous or that the state courts' legal conclusions were unreasonable or contrary to established United States Supreme Court law.

Ground five does not warrant habeas relief.

### GROUND SIX

**PETITIONER'S SENTENCE OF DEATH IS UNCONSTITUTIONAL IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION. THE STATE COMMITTED PROSECUTORIAL MISCONDUCT IN THE PRESENTATION OF MR. LAMARCA'S PRIOR FELONY CONVICTION -- THE SINGLE AGGRAVATOR USED TO SUPPORT MR. LAMARCA'S SENTENCE OF DEATH.**

Lamarca contends that it was improper for the State to argue, and the state to consider, his prior violent felony conviction for kidnaping with a knife. He contends that a

decision by the Florida Third District Court of Appeal invalidated the weapon portion of the kidnaping charge. This claim has no merit.  This challenge to the prior conviction should have been raised, if at all, on direct appeal. *Sireci v. State*, 773 So. 2d 34, 44 (Fla. 2000)(stating that challenge to prior conviction should have been raised on direct appeal). Consequently, the Florida Supreme Court found the claim procedurally barred from review in Lamarca's motion for post-conviction relief.

The Florida Supreme Court stated:

> Lamarca's other claims of prosecutorial misconduct, i.e., that the prosecutor displayed photographs to the jury in violation of a court order and that the prosecutor improperly referred to the use of a knife in the commission of the offense for which Lamarca was previously convicted, are procedurally barred because they could have been raised on direct appeal. *See Spencer v. State*, 842 So. 2d 52, 60-61(Fla. 2003) (rejecting claims of prosecutorial misconduct because the basis for the claims was reflected in the trial record and, therefore, the claims should have been raised on direct appeal).

*Lamarca v. State*, 931 So. 2d 838, 851 n.8 (Fla. 2006).

Even if the claim were not procedurally barred, the claim has no merit.[20]  Martin testified at the evidentiary hearing that he presented copies of the judgments and sentences for Lamarca's prior violent felony convictions for attempted sexual battery with a knife and kidnaping with a knife. (C7, 922). Martin denied that the judgment was erroneous or had been vacated.  Martin explained: "No, sir, they came back with guilty as charged. The Court sent it back because Lamarca's sentence could not be enhanced with a deadly weapon because there was not a specific check mark on the verdict form, but the verdict form clearly said, guilty as charged. The information charges "kidnaping with a knife,

---

[20]  Lamarca's assertion that the Detective's memory of "what the victim had related occurred was selective" has no support in the record. Lamarca presented no evidence below to suggest the Detective's testimony was in any way questionable.

and the sexual battery with a knife."  (C7, 925). The opinion states that for sentencing purposes, the sentence could not be enhanced, but the fact Lamarca was found guilty of kidnaping and sexual battery "with a knife" was not altered. (C7, 925).

Lamarca was properly convicted of armed sexual battery and armed kidnaping. However, the state district court of appeal found the sentencing enhancement to a life felony improper, where the "trial court in its charge to the jury failed to explain the jury's obligation to make a finding as to whether or not a weapon was used, failed to define the use of a weapon as an element of the crime and failed to explain the effect of such a finding or lack thereof in terms of degree or penalty." *Lamarca v. State*, 515 So. 2d 309, 310 (Fla. 3d DCA 1987). Thus, it was only the sentencing enhancement, not Lamarca's conviction which was disturbed on appeal. The trial court recognized this distinction in denying this claim .[21] (C3, 378).

Ground Six does not warrant habeas relief.

Lamarca's Reply

The Court does not find any of Lamarca's arguments in the reply persuasive. Particularly, as to Ground Three, the Court rejects Lamarca's argument that his due process rights were denied by the trial court's limitation and exclusion of evidence relevant to his defense that Tonya Flynn killed her husband Kevin. The Florida Supreme Court found that the state trial court had erred, but that the error was harmless.  The state trial court applied a *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L. Ed.2d 705 (1967) harmless error analysis;  the *Chapman* standard is the Florida standard for harmless error.

---

[21] Lamarca failed to present any evidence in the state court to indicate that he was not armed with a knife during his prior violent felony convictions for kidnaping and attempted sexual battery.

(See *Smith v. State*, 762 So.2d 969, 970 (Fla.2000)(citing *Goodwin v. State*, 751 So.2d 537, 546 (Fla.1999), *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), *State v. Lee*, 531 So.2d 133, 136 n. 1 (Fla.1988), *State v. DiGuilio*, 491 So.2d 1129, 1135 (Fla.1986)).

Under Florida law, "The harmless error test ... places the burden on the state, as the beneficiary of the error, to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict or, alternatively stated, that there is no reasonable possibility that the error contributed to the conviction." *Goodwin v. State*, 751 So.2d at 540 (citing *Chapman*, 386 U.S. at 24). This Court rejects Lamarca's argument that the Florida Supreme Court's harmless error analysis is contrary to and an unreasonable application of Supreme Court law. The Florida Supreme Court set out the overwhelming evidence of Lamarca's guilt in its order as its basis for its finding that the error was harmless. (See Ground Three above).

Accordingly, the Court orders:

That Lamarca's petition for writ of habeas corpus is denied, with prejudice. The Clerk is directed to enter judgment against Hodges and to close this case.

## CERTIFICATE OF APPEALABILITY AND
## LEAVE TO APPEAL IN FORMA PAUPERIS DENIED

IT IS FURTHER ORDERED that petitioner is not entitled to a certificate of appealability. A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1). Rather, a district court must first issue a certificate of appealability (COA). *Id.* "A [COA] may issue ⋯ only if the applicant has made a substantial showing of the denial of a constitutional right." *Id.* at § 2253(c)(2). To make such a showing, petitioner "must demonstrate that reasonable jurists

would find the district court's assessment of the constitutional claims debatable or wrong,"
*Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484
(2000)), or that "the issues presented were 'adequate to deserve encouragement to
proceed further, ' " *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003) (quoting *Barefoot v.
Estelle*, 463 U.S. 880, 893 n. 4 (1983)). Petitioner has not made the requisite showing in
these circumstances.

Finally, because Petitioner is not entitled to a certificate of appealability, he is not
entitled to appeal in forma pauperis.

ORDERED at Tampa, Florida, on August 26, 2008.

ELIZABETH A. KOVACHEVICH
UNITED STATES DISTRICT JUDGE

Counsel of Record